**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPH J. SAVIANO, JR., | : | |
| | : | |
| Plaintiff, | : | CASE NO. 3:04-cv-522(RNC) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF WESTPORT, | : | |
| | : | |
| Defendant. | : | MARCH 5, 2010 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
TOWN OF WESTPORT'S MOTION FOR SUMMARY JUDGMENT ON REMAND[1]**

**I.      SUMMARY**

The Town employed Saviano as the Assistant Superintendent of Greens for Longshore

Golf Course ("Longshore") in its Department of Parks and Recreation from April 5, 1984,

through his suspension on September 17, 2002, and subsequent involuntary termination on

December 2, 2002.  (Ex. 84, Affidavit of Joseph J. Saviano, Jr. (hereinafter, "Pl.'s Aff.") ¶¶ 3, 4)

Prior to his termination, Saviano opposed the Town's unlawful discrimination toward his

disabled co-worker Steven Welch ("Steven"), testified at a Department of Labor (DOL) hearing

for Steven, contested the hostile work environment and unequal disciplinary treatment meted out

to Steven, and, while still employed by the Town, filed a complaint with the Commission on

Human Rights and Opportunities (CHRO) regarding the Town's consequent retaliatory

discrimination against Saviano.[2]  (Ex. 84, Pl.'s Aff. ¶¶ 11, 14, 15, 20, 30, 43-44, 62-63, 64-65,

66, 102) (Def.'s Supp., Ex. A at 7, Doc. # 71)  Steven, a physically and mentally disabled

individual whom Saviano worked with and  supervised, worked at Longshore as a

Driver/Laborer and then, from November 1, 1999, as a Laborer II until his disability retirement

---

[1] An Outline of Plaintiff's Memorandum of Law may be found at Appendix A following the certification page.
[2] The CHRO Complaint at Exhibit 55 is not the CHRO Complaint referenced in paragraphs 7-9 of Saviano's
Amended Complaint underlying this action.  (Doc. # 88)

on November 1, 2003.  (Ex. 84, Pl.'s Aff. ¶ 6) (Ex. 1, Letter)  When Saviano experienced

adverse employment actions as a result of his opposition to unlawful discrimination, he filed a

complaint with the CHRO in 2001 alleging that he was harassed, retaliated against, and treated

differently as a result.  (Ex. 55, CHRO Complaint) (Ex. 84, Pl.'s Aff. ¶ 61)

      From April 21, 1999, through Saviano's termination, the Longshore Superintendent of

Greens, Daniel Rackliffe ("Rackliffe"), and the Director of the Town Department of Parks and

Recreation, Stuart S. McCarthy ("McCarthy"), maintained covert log books that, among other

things, called Steven an "albatross" and fixated on terminating Steven's and Saviano's

employment.  (Ex. 25, Rackliffe's Log) (Ex. 26, McCarthy's Log) (Exs. 57-62, Rackliffe's

Calendar)  The last written evaluation disclosed to Saviano of his work performance issued in

1998, four years prior to his termination.  (Ex. 56, Mem.) (Ex. 83, Def.'s Interrogatory

Responses ¶ 3)  Following Saviano's return to work from worker's compensation leave in 2002

and upon the dismissal of his CHRO complaint on jurisdictional grounds that same year,

Rackliffe accused him of sabotaging the Town's golf course.  (Affidavit of John Broadbin

(hereinafter, "Broadbin Aff."), Ex. D, Doc. # 34)  The charge was unsubstantiated.  (Affidavit of

John J. Izzo (hereinafter, "Izzo Aff."), Ex. A, Doc. # 93-3)  When Rackliffe learned on

September 17, 2002, that Saviano would not be terminated for sabotaging the golf course, he

manipulated a confrontation with Saviano and suspended him that same day.  (Ex. 84, Pl.'s Aff.

¶¶ 61-81) (Ex. 83, Def.'s Interrogatory Responses ¶ 14)  The Town ultimately terminated

Saviano's employment on December 2, 2002, following a hearing before the Town's Board of

Selectmen ("Board").

      At Saviano's termination hearing on December 2, 2002, the Town's attorney discussed

the CHRO complaint, indicated to the Board that Saviano had complained about retaliatory

treatment in the CHRO complaint, and informed the Town that Saviano intended to file a lawsuit against the Town.  (Def.'s Supp., Ex. A at 6-8, Doc. # 71)[3]  The Board consisted of First Selectwoman Diane Goss Farrell, Selectman John J. Izzo, and Selectman Carl W. Leaman. (Def.'s Supp., Ex. A, Doc. # 71)  The Town's attorney read Saviano's CHRO complaint at the termination hearing.  (Def.'s Supp., Ex. A at 7, Doc. # 71)  By their affidavits, Selectmen Izzo and Leaman claim not to have recalled the Town attorney's discussion about Saviano's discrimination complaint at the December 2, 2002, hearing until reading the transcript of the proceeding at or near the time they completed their affidavits in December of 2009.  (Izzo. Aff. ¶ 7, Doc. # 93-3) (Affidavit of Carl W. Leaman (hereinafter, ("Leaman Aff.") ¶ 7, Doc. # 93-4) Despite not remembering the Town attorney's comments about Saviano's CHRO complaint of discrimination, Izzo and Leaman represent that what they could not remember in the absence of a transcript, but which undoubtedly occurred, had no effect on their decision at the time.

Following Saviano's termination on December 2, 2002, the Town's personnel manager, Thomas Hamilton ("Hamilton") asked Saviano to submit a request for retirement benefits.  (Ex. 81, Letter with Request for Retirement Benefits)  (Ex. 82, Letter)  Saviano, who was eligible for retirement at that time, modified the Town's retirement request form to represent that his request was conditional.  Saviano wrote:

> Due to the towns termination of my employment pending
> Arbitration with Ct. State Board of Arbitration … the date of my
> termination as stated in retirement Plan for Municipal Employees
> … This Request is Due to the towns termination of my
> employment and is not of my choice

(Ex. 82, Request for Retirement Benefits)  Hamilton objected and informed Saviano that the Request for Retirement Benefits form could not be modified.  (Ex. 81, Letter)  However, Saviano

---

[3] Paragraphs 7 and 8 claiming not to recall the Town's attorney's discussion of Saviano's CHRO Complaint of Izzo's Affidavit and Leaman's Affidavit are nearly identical.  (Izzo Aff. ¶¶ 7, 8, Doc. # 93-3) (Leaman Aff. ¶¶ 7, 8, Doc. # 93-4)

did not submit a new form and the Town commenced payment of retirement benefits based on

the modified request submitted by Saviano.  (Ex. 82, Request for Retirement Benefits) (Ex. 80,

Letter)

The matter of Saviano's termination proceeded through the four-step grievance process

as outlined in the Collective Bargaining Agreement (CBA) between the Town and AFSCME

Council 4, Local 1303-194 ("Local 1303-194").  Saviano incorporates the facts stated in his

Affidavit of Illegal Discriminatory Practices filed with the CHRO, dated April 28, 2004, and

signed under oath, in support of his claim that the Town did discriminate against him in delaying

the Step IV arbitration of his grievance by seeking a stay before the State Board of Mediation

and Arbitration (SBMA).  (Leaman Aff., Ex. E, Doc. # 93-5) (Affidavit of James Castelot

(hereinafter, "Castelot Aff.") ¶ 18, Doc. # 70) ("At the April 14, 2004, DOL-SBMA hearing in

the matter of Town of Westport and AFSCME Council 4, Local 1303-194 (SBMA Case # 2003-

A-0566), the DOL-SBMA granted the Town's request, over the Union's objection, to stay

Plaintiff's DOL-SBMA hearing pending a settlement or judgment in the above-captioned federal

case.").

The unprecedented nature of the adjournment of Saviano's arbitration is demonstrated by

its contrary effects upon settled principles of employment law.  An individual claiming damages

from discrimination is compelled to mitigate his or her damages. The most efficient manner of

mitigating damages is to return to work.  The most efficient manner of returning Saviano to work

was through arbitration.  General Statutes § 31-51bb sets forth the difference between a contract

claim subject to a CBA and other claims:

> No employee shall be denied the right to pursue, in a court of
> competent jurisdiction, a cause of action arising under the state or
> federal constitution or under a state statute solely because the
> employee is covered by a collective bargaining agreement.

> Nothing in this section shall be construed to give an employee the
> right to pursue a cause of action in a court of competent
> jurisdiction for breach of any provision of a collective bargaining
> agreement or other claims dependent upon the provisions of a
> collective bargaining agreement.

This statute provides that there are claims brought pursuant to a CBA that cannot be brought in court. In Saviano's case, the Union brought his contractual claims under the CBA to the SBMA. These claims could not have been brought in federal court. The claims that Saviano brought in federal court claiming anti-discrimination could not have been brought before the SBMA. (Castelot Aff. ¶¶ 10-15, Doc. # 70) By forcing the Union to forego a timely resolution of Saviano's contractual claims because of Saviano's federal anti-discrimination suit, the Town attempted to force Saviano to choose between a timely resolution of his contractual claims which could return him to work quickly or to pursue federal claims. In this manner the Town did retaliate against Saviano for the protected activity of pursuing a discrimination action in court.

The SBMA did not address Saviano's claims of discriminatory retaliation. (Castelot Aff. ¶¶ 10-15, Doc. # 70) After a hearing on whether Saviano was discharged for "just cause," the arbitration panel found that he was not and converted the termination into a suspension. (Affidavit of Thomas Hamilton (hereinafter, "Hamilton Aff."), Ex. E at 1, 5, Doc. # 93-6) Saviano returned to work. Despite the arbitration award and despite its acquiescence to the conditions set forth by Saviano in his Request for Retirement Benefits form, the Town has refused to modify Saviano's benefits and seniority in accordance with the SBMA's modification of the termination to a suspension. (Hamilton Aff., Ex. H, Doc. # 93-6)

## II.      FACTS

A.  Steven Welch's 1997 Termination and 1998 Return to Work

In 1997, Saviano observed that Rackliffe had become increasingly hostile toward him as well as toward Steven.  (Ex. 84, Pl.'s Aff. ¶ 7)  Through the discovery process in the instant action, Saviano obtained corroboration of Saviano's observations in numerous memoranda from Rackliffe to McCarthy.  (Ex. 84, Pl.'s Aff. ¶ 8)  As one statement of his intent, Rackliffe wrote on May 27, 1997:

> Steven [Welch] is once again up to his old tricks.  I have placed him on report five times since March of this year.  Frankly, it feels as though the town has given up on Steve and has left me to deal with this ongoing burden.  Steve simply is not working out and this situation needs to be dealt with.  Steve needs to be terminated.  He is unreliable, untruthful and generally an albatross around the 'town's neck.'

(Ex. 2, Mem.)  Rackliffe complained to McCarthy again on August 4, 1997, about Steven's continued employment:

> It isn't bad enough that we are saddled with a sub-par performer, but does the Town really need to have its face rubbed in it as well?  I cannot believe anyone, anywhere would say that we did not give Steve every possible break to help him be a productive member of our work force and society in general.

(Ex. 3, Mem.)  Rackliffe's conduct and his corroborating statements provide adequate measure of inference for a reasonable jury to find that his reference to "every possible break" implied accommodations provided to Steven because of his disabilities.  In Rackliffe's view, Saviano was the individual responsible for "rubb[ing]" the Town's face in Steven's continued employment.

By September 12, 1997, McCarthy had issued a notice of termination to Steven which was upheld through Step I and Step II of the CBA's grievance procedure.  (Affidavit of Stuart S.

6

McCarthy (hereinafter, "McCarthy Aff.") ¶ 6, Ex. A, Doc. # 39) (Exs. 4-10, Grievance

Documents)  As President of Local 1303-194, Saviano filed and followed Steven's grievance

through the process.  (Ex. 84, Pl.'s Aff. ¶ 11)  At the time of his termination, Saviano had held

the position of Local 1303-194 President, which is subject to election by the local membership

every three (3) years, for sixteen (16) continuous years.  (Ex. 84, Pl.'s Aff. ¶ 10)

When Rackliffe informed Steven's mother and conservator, Kay Welch ("Mrs. Welch")

of the termination, he noted that Mrs. Welch "was devastated" and in response to Mrs. Welch

asking whether there was "recourse" for Steven, Rackliffe told her "no" and indicated he was

"sorry it had come to this."  (Ex. 11, 09/15/1997 Notes)  However, there was recourse and the

Town did provide Steven additional "breaks" due to his mental and physical disabilities despite

Rackliffe's representation to Mrs. Welch and his memoranda to McCarthy.  (Ex. 12, Agreement

between Town and Local 1303-194) (Exs. 2, 3, 11, Mem.)

Following the Town's denial of the Step I and Step II grievances filed on behalf of

Steven, Saviano filed a request for a Step III grievance hearing on November 11, 1997, and

submitted it to the First Selectman, Joseph P. Arcudi.  (Ex, 13, Grievance Document) (Ex. 84,

Pl.'s Aff. ¶ 12)  The Step III grievance request was placed on hold pending the installation of

Diane Goss Farrell ("Farrell") as the Town's newly elected First Selectwoman.  (Ex. 14,

11/10/1997 Letter) (Ex. 84, Pl.'s Aff. ¶ 13)  Saviano met with Farrell in November of 1997 to

discuss Steven's disabilities and advocate on his behalf for reinstatement to his position as

driver/laborer.  (Ex. 84, Pl.'s Aff. ¶¶ 14-15)  A notice of hearing for a Step III grievance

concerning Steven's termination issued for January 9, 1998.  (Ex. 15, Notice)  In accordance

with a letter of agreement executed on February 20, 1998, Steven returned to work on March 2,

1998.  (Ex, 12, Agreement)  The agreement provided for a one year probationary period through

February 28, 1999.  (Ex. 12, Agreement)  Saviano knew that Rackliffe was not in agreement with the decision.  (Ex. 84, Pl.'s Aff. ¶ 16)

The harassment of Steven for his physical and mental disabilities continued at work by his co-workers including Richard Ballerini ("Ballerini") and Chris Rosenfield ("Rosenfield").  Rosenfield, a part-time non-disabled employee, believed he deserved Steven's full-time position more than Steven.  (Ex. 84, Pl.'s Aff. ¶ 20)  Less than one month after Steven's return to work, Rackliffe issued a warning to Steven on March 27, 1998.  (Ex. 16, Employee Incident Report) (Ex. 84, Pl.'s Aff. ¶ 21)  The March 27, 1998, warning to Steven involved his deficiency in emptying trash cans.  (Ex. 84, Pl.'s Aff. ¶ 22)  Many workers had different standards for emptying trash cans.  Some would not empty half full cans.  Even if a can were emptied it could be half full within three or four hours depending on business.  (Ex. 84, Pl.'s Aff. ¶ 23)  Rackliffe's warning to Steven on March 27, 1998, represented a renewed attempt to terminate Steven.  (Ex. 84, Pl.'s Aff. ¶ 25)

The Town denied the Union's grievance of Steven's March 27, 1998, warning through Step III of the process and then filed for a hearing before the SBMA.  (Exs. 17-21, Grievance Documents)  In October of 1998, after Rackliffe issued an additional written warning to Steven for an unauthorized absence, through Saviano's intervention, McCarthy investigated the matter and recommended an additional six (6) months probation after finding that the "necessary back up support, which was mutually agreed to be a condition for Steven's reinstatement, effective March 2, 1998, was not in place."  (Ex. 22, Mem.)  Saviano opposed the extension of six (6) months as outside the terms and conditions of the agreement and the probation was not continued.  (Ex. 84, Pl.'s Aff. ¶ 29)  Saviano prevailed in his position that if Steven had been absent because he did not have the necessary supports that the Letter of Agreement demanded

then he should not have been penalized with six (6) additional months of probation and he was

not because Saviano argued against it.  (Ex. 84, Pl.'s Aff. ¶ 30)

     B. <u>Saviano's Suspension and Steven Welch's Termination and Reinstatement in 1999</u>

     On April 21, 1999, Rackliffe asked Saviano to perform an assignment appropriate for a

Laborer instead of an Assistant Superintendent of Greens.  (Ex. 84, Pl.'s Aff. ¶ 31)  When the

employees that Saviano supervised observed Rackliffe assigning Saviano duties within the job

description of non-supervisory employees, they lost respect for Saviano's authority.  (Ex. 84,

Pl.'s Aff. ¶ 32)  Rackliffe was aware of this.  (Ex. 84, Pl.'s Aff. ¶ 33)  When Saviano told

Rackliffe that he was doing Ballerini's job, Rosenfield's job, and Rackliffe's job as well,

Rackliffe screamed at Saviano and told him to go home.  (Ex. 84, Pl.'s Aff. ¶ 34)  Saviano was

not sure if he had been suspended so he drove to Farrell's office and waited for her to arrive.

(Ex. 84, Pl.'s Aff.  ¶ 35)  When Farrell arrived, Saviano told her that he was upset and had

written a note because he remembered a Town employee who worked for McCarthy who had

been sent home a year or two before and committed suicide.  (Ex. 84, Pl.'s Aff. ¶ 36)  Saviano

was compelled to tell Farrell that being told to go home from work is upsetting and given the

recent suicide of a Town employee it was surprising that the Town had not changed its practices.

(Ex. 84, Pl.'s Aff. ¶ 36)

     From April 21, 1999, through June 14, 1999, the Town placed Saviano on a paid leave of

absence.  (Ex. 84, Pl.'s Aff. ¶ 37)  During this period, Rackliffe started a written log concerning

his subjective opinions of Saviano's conduct with entries that remained undisclosed and secret

from Saviano during the course of his employment ("Rackliffe's Log").  (Ex. 25, Rackliffe's

Log)  The memoranda contained in Rackliffe's Log were copied to McCarthy and kept in their

respective offices and in the offices of others who were copied, including Farrell.  (Ex. 83, Def.'s

Interrogatory Responses ¶ 25)  Rackliffe forwarded his log as an email attachment to McCarthy which McCarthy would then edit in his Microsoft Word file.  (Ex. 83, Def.'s Interrogatory Responses ¶¶ 16, 19)  McCarthy's Log was similar to Rackliffe's Log comprised in part of revised as well as verbatim entries contained in Rackliffe's log and other entries composed by McCarthy.  (Ex. 26, McCarthy's Log)  Rackliffe maintained a calendar as well and when he was informed on June 9, 1999, that Saviano would return to work on June 14, 1999, he wrote, in his work-related calendar, "can't fucking believe this!!"  (Ex. 27, Rackliffe's Calendar)  He drafted a memorandum dated June 9, 1999, to McCarthy indicating:

> I feel compelled to write this memo concerning Joe Saviano and the Town's inability to effectively deal with this situation.  I wish to repeat my concern for the safety of my crew and myself as I do believe that Joe is capable of violence.  I have made this clear to Mrs. Farell [sic] as well as Mr. Rovins and Mr. Hamilton.  Yet the Town is unable to act on this because certain conditions have not been met.  It is obvious, that for whatever reason, the town is powerless to 'protect' non-union personnel.  It is unfathomable to me that this kind of situation is not controllable.

(Ex. 28, Mem.)  In an April 21, 1999, entry to his log disseminated to McCarthy and any other Town officials who were copied, Rackliffe wrote:

> I'm told that my family and I should leave the park for safety reasons.  It appears that Joe may have threatened me.  The town had a police stationed in front of our house for 24 hours.

(Ex. 25, Rackliffe's Log)  The Westport Police Department (WPD) has no record of any police protection or surveillance afforded Rackliffe during April 21, 1999, or at any time.  (Ex. 23, 03/08/2005 WPD Fax)

Saviano saw a psychiatrist while he was on paid administrative leave as ordered by the Town.  The psychiatrist provided the Town a written opinion that Saviano did not pose a behavioral threat to himself or others and Saviano returned to work.  (Ex. 24, Letter)  Since

Rackliffe believed Saviano would not return to work, Rackliffe did not complete a performance appraisal for Saviano in 1999.  He did not submit any performance appraisals at all after 1998 because of, according to his supervisor, McCarthy, Rackliffe's "frustration with the system, his perception that the Town lacked interest in the problems at Longshore Golf Course, and his feelings that appraisals did not matter."  (Ex. 83, Def.'s Interrogatory Responses ¶ 3)

During Saviano's suspension, Steven was suspended as well for a two week period that began on June 4, 1999, and ended June 17, 1999.  (Ex. 29, Letter; Ex. 31, Letter)  Saviano grieved the suspension on June 10, 1999, while he was still out on his own paid administrative leave.  (Ex. 30, Grievance Document)  The grievance was denied.  (Ex. 32, Letter)  When Steven returned, McCarthy notified him that the Town would not accept his presence if it created a hostile work environment for his co-workers.  (Ex. 33, Letter)  Saviano, as Steven's supervisor, never observed Steven creating a hostile work environment.  (Ex. 84, Pl.'s Aff. ¶ 40)  Steven was then suspended on July 6, 1999, for failing to report to work on July 3, and July 4, 1999.  (Ex. 34, Letter)  McCarthy informed Steven that he was terminated effective July 6, 1999, for unexcused absences.  (Ex. 35, Letter)  Rackliffe summarized his frustration regarding the Town's failure to definitely terminate Steven:

> As you can well imagine, being down an employee on a holiday weekend causes unnecessary problems.  This is a regular pattern with Steve and in addition to adding to the staffs' burden, his actions coupled with the Towns [sic] hesitation to terminate, are having a major negative moral impact.  Once again, I recommend Steve's termination.  He is, without doubt, the most undependable employee I have ever been in contact with.

(Ex. 36, Mem.)  Rackliffe remained consistent in his effort to terminate Steven.  (Ex. 84, Pl.'s Aff. ¶ 41)

The Town not only denied Local 1303-194's grievances contesting Steven's 1999 suspension and termination, but opposed Steven's application to the Connecticut Department of Labor (DOL) for unemployment compensation benefits.  (Ex. 37, Decision)  When Steven was awarded unemployment compensation benefits by the DOL Administrator, the Town appealed to the DOL Referee.  (Ex. 37, Decision of Appeals Referee)  At the appeal hearing before the DOL Referee, Saviano testified on August 17, 1999, at the request of Steven's mother and conservator, Mrs. Welch.  (Ex. 84, Pl.'s Aff. ¶¶ 42-44) (Ex. 37, Decision of Appeals Referee)  Steven prevailed despite appearing, through his mother, *pro se*, against the Town's counsel.  (Ex. 37, Decision of Appeals Referee)

The Town's appeal to the DOL Referee was an effort to deny Steven unemployment compensation benefits.  This act, combined with the fact that the Town terminated Steven, does not comport with the Town's assertions that it sought to keep Steven employed with the Town. Saviano, at the request of Mrs. Welch, testified at the hearing held by the DOL Referee on August 17, 1999.  (Ex. 84, Pl.'s Aff. ¶ 42)  Saviano testified that Steven "suffered a brain injury when he was 11 and ½ years of age" and that "[d]ue to the injury, he has problems remembering things and has been diagnosed with comprehension problems."  (Ex. 84, Pl.'s Aff. ¶ 44)  The DOL Referee included Saviano's statement in her findings.  (Ex. 37, Decision of DOL Referee ¶ 4)

The Decision of the Appeals Referee was mailed to the Town on October 15, 1999, and by November 1, 1999, an agreement was in place for Steven to return to work that day.  (Ex. 45, Decision of Appeals Referee) (Ex. 38, Agreement)  Only when the Town lost its DOL appeal because Steven's conduct did not meet the statutory requirements for dismissal, did it enter into discussions with the Saviano, as Union President, to arrive at an agreement for Steven's return to

work on November 1, 1999.  Rackliffe wrote in his calendar:  "Stu – Informed me that Steve is

coming back!!"  (Ex. 39, Calendar Entry)  He then met with Farrell about Saviano and wrote:

> Meeting with Diane Farrell did not go well – as expected no
> change.  Nice weekend with Jane.  But back to this BS today.  Still
> having trouble shaking this.  Hope to take M-F off.

(Ex. 40, Rackliffe's Calendar) and wrote:

> "Met with Dianne to discuss this situation with Joe and got no
> help."

(Ex. 25, Rackliffe's Log)  Immediately following Steven's reinstatement on November 1, 1999,

Rackliffe told part-time employees at the shop that if it was not for Saviano then Steven would

not be returning and filling a twelve month position.  (Ex. 84, Pl.'s Aff ¶ 48)  In August of 2001,

Saviano filed a discrimination complaint with the CHRO claiming that he had been retaliated

against for previously opposing discrimination against a person protected under the ADA and

had assisted such person and been retaliated against for such assistance.  (Ex. 55, CHRO

Complaint) (Declaration of Warren L. Holcomb, Attachment, Doc. # 93-8)

   C.   Steven Welch's 2000 Suspension and Saviano's Grievances

   Rackliffe's complaints against Saviano and Steven continued in 2000.  (Exs. 25-27, 39-

40, 45-49, 5, 57-62, 69 Rackliffe's Log, McCarthy's Log, Rackliffe's Calendar)  By this time

Rackliffe had sought and succeeded in terminating Steven's employment on two occasions but

each time Steven had been reinstated over the objections of Rackliffe.  In August of 2000,

McCarthy suspended Steven for a racial slur directed at a co-worker.  (Ex. 74, Letter)  Saviano

opposed the suspension on the ground that he had witnessed the incident and observed the co-

worker direct disparaging remarks toward Steven about Steven's disabilities and no discipline

was imposed on the co-worker.  (Ex. 84, Pl.'s  Aff. ¶¶ 49-54)  By notice dated August 14, 2000,

the Union, through Saviano grieved the resulting five (5) day suspension.  (Ex. 75, Grievance

Document)  At a September 21, 2000, meeting to discuss the Town's concerns regarding

Welch's behavior, contributing factors to his behavior that were discussed included:

- Steven's reaction to the hostility he may feel from fellow employees; and
- The need for more awareness by fellow workers regarding his disability.

(Ex. 43, Mem.)  Rackliffe's and McCarthy's hostility toward Steven was not discussed as

Rackliffe's Log and McCarthy's Log were not disclosed to Saviano prior to his December 2,

2002, termination.

Saviano, as the Union President, and the Town met on October 10, 2000, for a combined

Step I and II grievance process meeting.  (Ex. 76, Letter)  A representative from STAR, Inc.

arranged for a complete psychological examination for Steven and a follow-up meeting was

scheduled for October 23, 2000.  The psychologist noted:

> In addition, Mr. Welch talked in a slightly sad manner about
> feeling left off the work board in the morning.  Specifically, there
> is a board which lists the workers and their job responsibilities for
> the day.  This seems to significantly affect Mr. Welch in terms of
> feeling left out.  He had no awareness that he tends to do his job
> slower than others or the possible impact on other workers feelings
> toward him if this were the case.

(Ex. 44, Evaluation)  Steven remained employed in Rackliffe's division.  The meetings in

September and October of 2000 included Saviano, Rackliffe, and McCarthy.  (Ex. 43, Mem.)

When Steven returned to work, Richard Ballerini, a shop mechanic under Rackliffe's

supervision, wrote Steven's name on the assignment board in indelible ink as a joke about

Welch's sensitivity to being left out of assignments.  (Ex. 84, Pl.'s Aff. ¶ 55)

D. Rackliffe's Increased Hostility, Saviano's Worker's Compensation Leave,
   Suspension and Termination in 2001-2002

Rackliffe's entries in his calendar and log grew increasingly hostile toward Saviano in

2001.  He wrote on:

- January 3, 2001 – "Rich [Ballerini] & I talked after work.  Both feel Joe's mental state is fragile and that he is a concern.  This is amplified by guy who shot two co-workers.  Shrink in CNN interview – Guy was classic (1) loner; (2) no friendly; (3) paranoid."  (Ex. 45, Rackliffe's Calendar)
- January 5, 2001 – "Joe Vacation Day, - What a relief!!!" (Ex. 46, Rackliffe's Calendar)
- January 10, 2001 – "I saw Stuart and mentioned my continued concern about Joe.  Usual response – document – a fucking joke!!"  (Ex. 47, Rackliffe's Calendar)
- March 5, 2001 – "Met with Diane [Farrell] – more of same bullshit – it's all about the bottom line!!  More deaths in Calif. Kids at school."  (Ex. 48, Rackliffe's Calendar)
- April 6, 2001 – "Off to Beijing – what a relief!!  Two weeks no JS [Joe Saviano]."  (Ex. 49, Rackliffe's Calendar )

Saviano observed Ballerini, Steven's co-worker, direct disparaging remarks toward Steven about his disability on numerous occasions and now Ballerini had access to the results of Steven's psychological evaluation and was Rackliffe's confidant.   (Ex. 45, Rackliffe's Calendar) (Ex. 84, Pl.'s Aff. ¶ 55)

In August of 2001, Saviano's concern regarding Steven's treatment at work compelled him to circulate to Farrell an article regarding discriminatory and retaliatory conduct under the ADA. (Ex. 77, ADA Notes) (Ex. 84, Pl.'s Aff. ¶ 60)  Farrell distributed the article to McCarthy and Hamilton.  (Ex. 77, Article)  The first page of the article contained the section:  "Retaliation, Unlawful Termination, and Other Forms of Unfair Job Practices."  According to the article, "[p]rotection against employer retaliation takes two forms."  The first protection prohibits "retaliation for the opposition to unlawful acts of discrimination."  The second protection involves "freely participating in actions taken against discrimination."  (Ex. 77, Article)

From November 21, 2001, until July 8, 2002, Saviano was absent from work for worker's compensation leave due to a back injury sustained on the job.  (Ex. 84, Pl.'s Aff. ¶ 67) (Ex. 50, Medical Evaluation)  When Saviano returned, Rackliffe noted on July 20, 2002, "Joe is really helpful.  It is like being in a pit of vipers."  (Ex. 51, Rackliffe's Calendar)  Saviano observed that

Longshore had sustained a long, hot summer and the greens were damaged from wilt and lack of water.  (Ex. 84, Pl.'s Aff. ¶ 68)

In August of 2002, the month following Saviano's return to work and while Saviano was still on limited duty, Rackliffe reported that Saviano had sabotaged the golf course (Ex. 52, Mem.), an allegation that was found later to be untrue in a September 17, 2002, investigation report issued by the Town.  (Broadbin Aff., Ex. D, Doc. # 34)  When Rackliffe returned from his August vacation, he came out of his office as Saviano passed and screamed at him that the greens were in such bad condition that he would fire Saviano for sabotage.  (Ex. 84, Pl.'s Aff. ¶¶ 69, 73)[4]  During the afternoon of September 17, 2002, following McCarthy's receipt of the investigation report that recommended a transfer and demotion but not Saviano's termination, Rackliffe coordinated a confrontation with Saviano that ended in Saviano's suspension on that date and subsequent termination.  (Ex. 84, Pl.'s Aff. ¶¶ 76-96)[5] (Ex. 83, Def.'s Interrogatory

---

[4] In a May 28, 2004, newspaper article entitled, "Grass is Greener on the Irrigated at Longshore," the chairman of the Westport Golf Advisory Committee, Fred Hunter, commented on a new $1 million irrigation system improvement project:  "That old system was eating up money for repairs."  Mr. Hunter noted that turning on the old system was like "turning on a bathtub."  Rackliffe agreed, stating that the "old irrigation system 'was not very accurate.''  (Ex. 79, Article)

[5] Saviano's Affidavit (Ex. 84) provides at ¶¶ 76-96:  "On September 17, 2002, I arrived at work at approximately 5:30 A.M.  I had coffee in the lunchroom and waited for assignments to be posted on the board.  My first assignment that morning was to cut collars, approaches, and two fairways.  I received this assignment at approximately 6 A.M.  I completed the job at approximately 8:30 to 9:00 at which time I entered the lunchroom for a break.  Between 8:30 and 9:00 A.M., I looked at the assignment board for my next job and it was to take a bucket loader and a part-time employee to remove ground up wood chips from stump grinding machine and fill in holes with top-soil and seed it.  My back was bothering me and I was in pain after having sat on riding mower cutting collars so I went into Rackliffe's office to possibly check out wiring in the irrigation system because my back was bothering me.  I waited until Rackliffe finished talking on the phone and he said can't you just do what the fuck I tell you, why do you always have to question my authority, so I walked out of the office to go see what the wood chip job entailed.  While I was walking out of the Golf Building, Richard Ballerina approached Rackliffe and asked him what was going on and Rackliffe told him, 'Don't worry about it, he's my little nigger.'  I continued to leave the building, picked up a shovel and a rake, tossed them in the back of a work cart.  Rackliffe followed me out the door telling me to take the tractor and not the golf cart and I told Rackliffe that I had a note from the doctor limiting me to five days work per week, instead of seven, and he said just what the fuck can you do and I said your job and he said I had to start treating him with respect and I said are you going to stop treating me like your little nigger.  Rackliffe said that was uncalled for and walked away.  I proceeded to get on the golf cart, picked up the other employee and completed the assigned task.  At about 1:00 P.M., I finished the task, checked on the conditions of the greens and Rackliffe asked to see me in his office.  I requested union representation.  Rackliffe tried to call Joey Arciola at the Parks and Recreation Department but could not find him and told me to finish what I was doing which was checking on conditions of greens and whether they needed water or not.  About 15 minutes before it was time for me to leave at

16

Responses ¶ 14)  From Rackliffe's perspective, he had met the "certain conditions" for Saviano's termination that he had written Farrell about on June 9, 1999.  (Ex. 38, Mem.)

E.  Steven Welch's Retirement in 2003

Although Kristy Hanson ("Ms. Hanson"), who was employed by The Kennedy Center, Inc. in Trumbull, Connecticut, and worked with Steven as a Job Coach, reported in an April 14, 2004, letter "To Whom it May Concern" that were it not for the support of Rackliffe, Steven would have lost his employment, Rackliffe's private log and calendar and efforts to terminate Steven in 1997, 1998, and 1999, do not support Ms. Hanson's conclusion.  (Ex. 53, Letter) (Affidavit of Kristy Hanson (hereinafter, "Hanson Aff.") ¶ 4, Doc. # 36)  Immediately following Rackliffe's success in ensuring that "certain conditions" were met on September 17, 2002, for Saviano's termination, Rackliffe again followed McCarthy's admonition to "document" and started an undisclosed log for Steven. (Ex. 54, Rackliffe's Second Log)  Rackliffe's Second Log, this time regarding Steven, commenced on October 9, 2002, less than one month after Saviano's termination.  (Ex. 54, Rackliffe's Second Log)  Finally, in the absence of Saviano's protective influence, McCarthy and Rackliffe were unopposed in their efforts to terminate Steven.  (Ex. 78, Letter)  According to Paul Bauman at The Kennedy Center, Inc., in July of 2003:

> Steve's managers at Longshore have expressed high levels of frustration at Steve and his low work output.  Furthermore, Steve's co-worker's have expressed diminished patience with him, and job coaches have witnessed them yelling at Steve.  My opinion is that at this point Steve is in a hostile work environment, daily impacting upon his quality of life.

---

2:30 PM, Rackliffe came out on a cart to find me and yelled my name to follow him back to the shop.  Arciola was at the shop and we went into Rackliffe's office.  During the five or six minute meeting, Rackliffe told me that one more outburst like that and he would have to discipline me, and I said what outburst and he said you know.  I said 'shit' and he said that was not good enough.  He said I had to start treating him with respect.  I said are you going to stop treating me like your little nigger.  He said that is one.  He stood up and stated again you have to start treating me with respect, I repeated the same thing.  Rackliffe said that is two.  Arciola said come on Joe you do not have to put up with this.  Rackliffe did not give me permission to leave so I stood there.  He again demanded respect.  I repeated one more time the same phrase.  Rackliffe said that is three I going to suspend you.  He was upset, talking loud.  I said thank you and asked for permission to leave.  Arciola and I walked out of shop to the picnic table."

(Ex. 78, Letter)  Saviano had been suspended only nine months when conditions in the workplace had deteriorated to such a degree that, without Saviano's protection from Steven's now unbridled, hostile co-workers and managers, Steven could no longer survive.

Rackliffe and McCarthy successfully convinced Mrs. Welch, Farrell, and Steven's service providers that the inclination toward retirement for Steven was a circumstance that had risen of its own accord and not as a result of continuous and unopposed harassment of Steven. Steven's retirement became effective on November 1, 2003.  (Ex. 1, Letter)  He had lasted with the Town for more than fourteen (14) years while Saviano was employed as the Assistant Superintendent of Greens but had deteriorated to such a degree within nine (9) months of Saviano's suspension that his retirement was a foregone conclusion.

     F.   <u>Saviano's Work Performance, Record, and Rackliffe's and McCarthy's Secret Logs</u>

          *i.   Personnel Evaluations*

Saviano excelled in his position as Assistant Superintendent of Grounds.  In 1984, his overall rating of "Outstanding" was the highest possible.  He was evaluated as "Satisfactory" in 1985 and "Excellent" in 1990.  From 1992 until 1994, Saviano's overall ratings were the equivalent of an above average evaluation.  Then, from 1994 until 1998, Saviano's overall ratings were the second highest available, with only five (5) percent of employees being eligible for the topmost rating.  In fact, Saviano was recognized by the Town's "Safety Committee" in 1997 for his exemplary work and his superlative efforts in constructing bunkers, with specific notations about Saviano's strengths in construction.  (Ex. 84, Pl.'s Aff. ¶ 98)

          *ii.   The Temporal Connection Between Saviano's Protected Activity and the Cessation of Formal Evaluation of Saviano's Performance*

Rackliffe refused to formally and openly evaluate Saviano after 1998.  (Ex. 56, Mem.) (Ex. 83, Def.'s Interrogatory Responses ¶ 3)  In the course of the investigation into Rackliffe's

allegations of golf course sabotage against Saviano, Rackliffe did not hesitate to inform one of the investigators, Ron Kelly, that Rackliffe simply had refused to perform this primary function of his supervisory position.  (Ex. 56, Mem.) (Broadbin Aff., Ex. D, Doc. # 34)  Rackliffe lied in the course of the investigation when he alleged threatening conduct by Saviano and told Ron Kelly that a police presence had been necessary at Rackliffe's residence in April of 1999.  (Ex. 56, Mem.) (Ex. 23, WPD Fax)

The events prior to, during, and after 1999 tell why Saviano no longer received formal evaluations.  From September of 1997 until June of 1998, Saviano pursued at least five grievances on Steven's behalf.  In April of 1999, Farrell suggested that Saviano undergo a mental health evaluation.  The Town placed Saviano on a non-disciplinary paid administrative leave of absence and when he was evaluated the physician advised that he was fit for work. Rackliffe presumed the Saviano would not return to work.  (Ex. 83, Def.'s Interrogatory Responses ¶ 3)  When Saviano returned, Rackliffe and McCarthy, instead of documenting evaluations that could be reviewed and acted upon the Town, as necessary, started logs directed at, but not disclosed to, Saviano.

      iii.   *The Secret Logs Prepared to Document Cause for Saviano's Termination Contain Inconsistencies and Unwarranted Subjective Conjecture*

Rackliffe wrote his comments about Saviano in a work-based calendar which he then transferred to a log and emailed as attachments to McCarthy.  (Ex. 83, Def.'s Interrogatory Responses ¶ 19)  McCarthy edited Rackliffe's email attachments and created another log.  (Ex. 83, Def.'s Interrogatory Responses ¶ 3)  McCarthy then obtained other information from the files in his office.  Rackliffe would provide other information to McCarthy verbally.  (Ex. 83, Def.'s Interrogatory Responses ¶ 3)  None of the activity or information gathering was disclosed to Saviano.

When Saviano requested his personnel file following his termination, he did not receive Rackliffe's Log or McCarthy's Log and was not aware of their existence until discovery in the instant matter.  (Ex. 84, Pl.'s Aff. ¶ 75)  Each log contained approximately eighty (80) entries. Despite the performance and behavioral related issues attributed to Saviano by Rackliffe, only three (3) actual warnings were issued to Saviano during the three (3) years covered by the Town's Secret Logs.

The Town used the Secret Logs to create an appearance of documentation supporting termination.  Rackliffe complained on July 23, 2001:

> Met with Dianne, Len Rovins, and Tom Hamilton.  This meeting was fruitless.  Rovins continues to insist that we do not have enough to prove out case.  It seems to me that Len simply does not wish to take this on. Dianne simply follows his lead.  Stuart is vehement about doing something.

(Ex. 25, Rackliffe's Log)[6]

These Secret Logs were the Town's attempt to justify a retaliatory act of termination that it intended to effectuate against Saviano in the future.  The retaliation was planned, coordinated, and covertly executed over a lengthy period because the Town knew that Saviano would grieve any unwarranted disciplinary action through the CBA's grievance process.  Chart One at Exhibit 85 includes some of the complaints entered by Rackliffe and McCarthy in memoranda and the logs concerning Saviano's opposition to the Town's treatment of Steven.

Rackliffe and McCarthy displayed a tone and demeanor when writing about Saviano, the subjective bias of which should have been apparent to Farrell or any other Town employee in a position of equal or greater authority than Rackliffe and McCarthy.  These entries had no relevance to Saviano's professional abilities.  The absence of any other Secret Logs concerning

---

[6] The individual referred to as "Rovins" is the Town attorney who read Saviano's CHRO complaint to the Board at the December 2, 2002, hearing on Saviano's termination.  (Def.'s Supp., Ex. A at 1, Doc. # 71)

other employees creates a vacuum of comparative data.  It is unknown for instance whether

Richard Ballerini ever "brooded" or had a "weird" look in his eye.  It is unknown whether Chris

Rosenfield was ever "agitated."  Rackliffe's and McCarthy's selection of Saviano for these kinds

of observations was directly related to a discriminatory animus against someone they had

targeted because of his advocacy for Steven and whom they perceived to have a mental problem

because of his support for Steven and distress when Steven was being treated unfairly.  Rackliffe

and McCarthy could not understand anyone who cared about Steven whom they only viewed as

a troublesome "albatross."  Chart 2 at Exhibit 85 illustrates a timeline of these observations.

None of Saviano's co-workers who continuously elected Saviano to represent them as president

of Local 1303-194, ever lodged written complaints about Saviano's purportedly unstable

behavior.  (Ex. 84, Pl.'s Aff. ¶¶ 10, 100)

     Through an analysis of the logs, one may detect various instances where Saviano was

disciplined more harshly than similarly situated employees.  Chart Three at Exhibit 85 illustrates

a timeline of such incidents.  The Town made log entries against Saviano if he did not disregard

medical restrictions to perform certain tasks which would aggravate his condition.  Chart Four at

Exhibit 85 illustrates a timeline of such incidents.

     The foregoing Charts 1 through 4 indicate a convergence of factors demonstrating

Rackliffe's and McCarthy's retaliatory intent.  Shortly after Saviano protested actions by the

Town, which he had a good faith belief were illegal, in defense of Steven, the Town retaliated

by: (1) questioning Saviano's sanity; (2) creating Secret Logs about Saviano to track his

activities and accumulate a critical mass of baseless subjective observations Saviano could not

address in a formal evaluation process; (3) holding Saviano to a higher standard than other

employees; (4) ignoring Saviano's medical disability and misconstruing his physical limitations

as insubordination; and (5) using the heightened scrutiny of Saviano as a subjective basis for his

termination.  (Ex. 69, Rackliffe's Calendar)

G.  Rackliffe and McCarthy Disapproved of and Retaliated Against Saviano for
    Protecting Steven's Rights

Rackliffe's and McCarthy's inability to accommodate Steven's disability was a

significant factor behind their retaliatory actions against Saviano.  Steven was mistreated in the

following ways: (1) Steven was not integrated as a contributing member of the grounds division;

(2) Rackliffe applied disparate treatment and disciplinary measures against Welch; and (3)

Rackliffe covertly campaigned to terminate Steven's employment.

First, the Town did not properly integrate employees with mental disabilities.  On two

separate occasions it was necessary to schedule sensitivity training for the golf course employees

to teach them how to deal with a mentally disabled co-worker.  (Ex. 70, Mem.)  The

effectiveness of this training was negated in whole by Rackliffe's and McCarthy's attitude

toward Steven and the effect of their attitude on Steven's co-workers.  (Ex. 78, Letter)  Others

employed by the Town would verbally abuse Steven, with no recourse.  In fact, Saviano would

often intervene on behalf of Steven to prevent co-workers from ridiculing or fighting with

Welch.  (Ex. 84, Pl.'s Aff. ¶¶ 48-54)

Second, on other occasions, the Town would attribute Steven's mental disabilities to

laziness.   For example, Steven had short term memory problems as a result of his disability and

would often forget to do the tasks he was assigned.  (Ex. 71, Strategies)  However rather than

acknowledging Steven's disability, the Town on multiple occasions alleged that Steve "did

nothing" or implied that he was lazy.  (Ex. 72, Brian T. Sepot Log)[7]  One particular incident

highlights the Town's disparate standards applied to Steven.  On July 27, 2002, Welch was

---

[7] Brian Sepot replaced Saviano as Assistant Superintendent of Greens.

ridiculed by a Black co-worker.  (Ex. 84, Pl.'s Aff.  ¶¶ 49-54)  Steven uttered a racial slur directed towards the employee who was taunting him about his disability**.**  (Ex. 84, Pl.'s Aff.  ¶¶ 49-54)  Despite the fact that the Black employee was not mentally disabled and knew better than to ridicule a disabled co-worker, he was not disciplined.  (Ex. 84, Pl.'s Aff. ¶¶ 49-54)  The Town, through Rackliffe and McCarthy, attempted only to harshly disciple Steven.  (Ex. 84, Pl.'s Aff. ¶¶ 49-54)

Richard Ballerini, a mechanic in the grounds division, had numerous confrontations with Steven necessitating Saviano's intervention.  Ballerini is the same individual with whom Rackliffe commiserated about Saviano's instability.  Saviano wanted to address this issue further with Ballerini, however Rackliffe did not allow for such a resolution.   In fact, there was an instance where Ballerini verbally assaulted Steven saying: "If you ever say that to me again, I'll knock your fucking head across the shop."  (Ex. 84, Pl.'s Aff. ¶ 102)  There is no evidence of Ballerini being disciplined for this incident or any other incidents he had with Steven.  Conversely, the Town disciplined Steven for such behavior.

Third, the Town's mistreatment of Steven extends beyond a refusal to accommodate his disability.  There are instances of open hostility towards Steven combined with an unwillingness to accept his disabilities.  Rackliffe repeatedly complained to his superiors about the fact that Steven worked for the Town and that Saviano sought to protect Steven's interests. (See Chart 1, Ex. 85)  In one instance, Rackliffe referred to Steven as an "albatross."  (Ex. 2, Mem.)  In another instance, Rackliffe failed to implement certain steps recommended by experts to help Steven adapt to a workplace environment.  (Ex. 73, November, 2001 Notes)  Not only did the Town discriminate against Steven, it also mistreated Saviano after his supervisors alleged that Saviano was mentally unstable.  (See Chart 2, Ex. 85)

H. Rackliffe and McCarthy Purposefully, Maliciously, and Intentionally Provoked
   Saviano Into the Alleged Actions They Then Used to Justify Saviano's Suspension
   and Termination

In another attempt to terminate Saviano, the Town appointed a three (3) person

committee to investigate charges of sabotage raised by Rackliffe.  (Broadbin Aff., Ex. D, Doc. #

34)  Rackliffe, unable to rely on Farrell, whom he dismissed as ineffectual, or a committee that

ultimately found that there was not cause to terminate Saviano, provoked Plaintiff into a reaction

on the same day that he received the committee's report.  (See footnote 5, above)

Though the Town alleged that Saviano intended the term "nigger" as a racial slur, the

record and Saviano's testimony indicate otherwise.  (Ex. 84, Pl.'s Aff. ¶ 97)  First, it was

Saviano who informed Steven that it was improper to address a Black person using that word.

Second, there were no persons of color present when Saviano used the word.  Third, even

assuming that Saviano meant the term in a racially derogatory manner, his use of the word was

no more incorrect than Rackliffe's derogatory terms for Steven and in work related documents

and notations referring to Saviano as "Psycho Joe." (Ex. 26, 07/29/1999 McCarthy's Log)

McCarthy writes in his July 29, 1999, log entry that Rackliffe claims that "[t]he crew is referring

to Joe as "Psycho Joe."  (Ex. 26, McCarthy's Log)  In Interrogatory No. 17, McCarthy states that

the "defendant does not know which of its employees ever referred to the plaintiff as "Psycho

Joe." (Ex. 83, Def.'s Interrogatory Responses, ¶ 17)

Additionally, given that the Town failed to discipline any employee for verbally

disparaging a mentally disabled co-worker, a reasonable trier may find it to be a disparate

treatment of Saviano to discipline him so severely for a statement that was not meant as a racial

slur, but rather an attempt to articulate the unacceptable manner in which he was being treated.

Finally, the term "nigger" has been and is used to refer to a socially, economically, or politically disadvantaged group, not merely as a reprehensible slur against a Black individual.[8]

In essence, it took more than three years and pages and pages of Secret Log entries for Rackliffe and McCarthy to manipulate the Town into believing that those "certain conditions" Rackliffe had referred to in his June 9, 1999, memorandum had been met.  Rackliffe believed that these circumstances arose in August of 2002, when he, as the golf course superintendent, decided to leave for vacation during the annual men's and ladies championship golf tournaments. The month following Saviano's return to work from a worker's compensation leave of ten (10) months for back surgery, Rackliffe used his vacation as an opportunity to falsely accuse Saviano of sabotaging the golf course.  Although Rackliffe failed to achieve his purpose when the Town only recommended transfer and demotion, his engineered confrontation with Saviano on September 17, 2002, was finally enough because, even though the Town never thought enough of racism to develop a policy, suddenly when Saviano used the term "nigger" in a context completely removed from any indicia of racism, the Town expressed its abhorrence and gave Rackliffe and McCarthy the termination they had been seeking since 1999.  Nine (9) months later Welch accepted disability retirement and his physician observed it was because his co-workers had been mean and hostile toward him.  Without Saviano's protection, Steven was finished and the part-time employee, Rosenfield, gained Welch's full-time position.  In addressing his retirement with the Town in 2003, the Union was not even involved to ensure Steven's fair treatment.  The Town did not even bother to copy its acknowledgement of retirement to Steven's Union.  (Ex. 1, Letter)

---

[8] See http://dictionary.reference.com/search?q=NIGGER, which provides the following two definitions for the term "nig·ger":  (1)  a. "Used as a disparaging term for a Black person: "You can only be destroyed by believing that you really are what the white world calls a nigger" (James Baldwin)."  b. "Used as a disparaging term for a member of any dark-skinned people."  2. Used as a disparaging term for a member of any socially, economically, or politically deprived group of people: "Gun owners are the new niggers[. . .] of society" (John Aquilino)."

## III.   ARGUMENTS OF LAW

### A.  Standard for Summary Judgment

Summary judgment should only be granted when the evidence set forth shows that there are no genuine issues of material fact and that the moving party would be entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991), cert. denied, 502 U.S. 849 (1991).

The trial court must view all inferences and ambiguities in a light most favorable to the nonmoving party when determining whether the record presents a genuine issue for trial.  See Bryant, 923 F.2d at 982.  A party successfully raises a genuine issue of material fact "if a reasonable jury could find for" that party.  Anderson, 477 U.S. at 252.  However, a mere factual dispute is not enough to defeat a motion for summary judgment, there must be a genuine issue of material fact.  Id. at 247-48.

When opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56; see  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(d).

### B.  Federal and State Retaliation Claims

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or

26

participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). For the purpose of retaliation claims, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Connecticut Fair Employment Practices Act (CFEPA), are governed by the same analytical framework as the ADA. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

  *i. Claims Under The ADA Are Analyzed In The Same Manner as Title VII Cases*

  Claims under the ADA are analyzed under the same three step burden shifting analysis established for actions determining violations under the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq. Treglia, 313 F.3d at 719. The plaintiff, bearing a *de minimis* burden, must first establish a *prime facie* case of retaliation by showing that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection between the alleged adverse action and the protected activity. Id.; Richardson v. New York State Dept. of Correctional Serv., 180 F.3d 426, 444 (2d Cir. 1999). After the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. Treglia, 313 F.3d at 721. Assuming the defendant has met this challenge, the burden then shifts back to the plaintiff to produce evidence sufficient to permit a rational finder of fact to conclude that the employer's explanation is mere pretext for illegal retaliation. Id (citing Cifra v. Gen. Elec. Co., 252 F.3d 205, 218 (2d Cir. 2001)).

  *ii. Prime Facie Retaliation*

   1. Defining a Protected Activity Known to the Defendant

  A protected activity under the ADA, Rehabilitation Act of 1973, or the CFEPA includes the following: (1) informing an employer of the intent to file a lawsuit against that employer for

27

violating one of the aforementioned laws; (2) a complaint regarding conduct the employee has a

good faith belief is illegal; (3) filing a grievance with one's union; or (4) filing a formal

discrimination complaint with one's employer.  <u>Treglia</u>, 313 F.3d at 720;  <u>Frasure v. Principi</u>,

367 F. Supp. 2d 245, 255 (D. Conn. 2005).

### 2.  Defining an Adverse Employment Action

An adverse employment action is "a materially adverse change in the terms, privileges,

duration and conditions of employment."  <u>Treglia</u>, 313 F.3d at 720.  The Second Circuit has

articulated a list of adverse employment actions which includes, but is not limited to, the

following: (1) discharge; (2) refusal to hire; (3) refusal to promote; (4) demotion or a less

distinguished title; (5) reduction in pay; (6) reprimand; (7) negative employment evaluation

letters; and (8) significantly diminished material responsibilities or other indices.  <u>Id.</u>; <u>Morris v.

Lindau</u>, 196 F.3d 102, 110 (2d Cir. 1999).  The Second Circuit has also implied that the list is not

strictly defined and that "lesser actions" may also be considered adverse.  <u>See</u> <u>Morris</u>, 196 F.3d

at 110; <u>see</u> <u>also</u> <u>Treglia</u>, 313 F.3d at 720; <u>Richardson</u>, 180 F.3d at 446.

### 3.  Defining Causal Connection

To establish a causal connection between allegedly adverse employment actions and a

protected activity, a plaintiff must show that the adverse employment actions occurred in

circumstances "from which a reasonable jury could infer retaliatory intent."  A plaintiff must

then show that this retaliatory intent was at least a substantial or motivating factor behind an

adverse employment action.  <u>Frasure</u>, 367 F. Supp. 2d at 256 (citing <u>Mt. Healthy City Sch. Dist.

Bd. Of Educ. V. Doyle</u>, 429 U.S. 274, 287 (1977)).  This causal connection (retaliatory

motivation) can be shown directly "through evidence of retaliatory animus directed against [the

plaintiff], . . . indirectly by showing that the protected activity was followed closely by the

discriminatory treatment, . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." Gallo v. Eaton Corp., 122 F. Supp. 2d 293, 303 (D. Conn. 2000) (citing Richardson, 180 F.3d at 447); see also Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001). Finally, since statements made by employers in certain situations constitute discriminatory speech, a plaintiff should be allowed to offer these statements as proof retaliatory animus.

### iii.  The Burden Shift And The Definition of Pretext In Retaliation Cases

If the plaintiff establishes a prima facie case of retaliation, the defendant must then articulate a legitimate, non-retaliatory reason for the challenged employment decision. Treglia, 313 F.3d at 721. If the defendant meets this burden, a plaintiff can defeat summary judgment by establishing that the employer's explanation is mere pretext for illegal retaliation. Id., (citing Cifra, 252 F.3d at 218).

In its motion for summary judgment, a defendant does not meet the burden of proffering a legitimate reason for its actions by: (1) merely contradicting the plaintiff's assertions or (2) by justifying an employment action with allegations that are challenged by the record evidence. See Treglia, 313 F.3d at 721; see also Frasure, 367 F. Supp. 2d at 257.

Mere denials or averments contrary to allegations made by the plaintiff do not merit summary judgment. See Treglia, 313 F.3d at 721; see also Frasure, 367 F. Supp. 2d at 257. In Treglia, the supervising police chief allegedly stated that the plaintiff would not receive a promotion "now or ever" and that if the plaintiff wanted to play "hardball, we can swing the bat back and play hard ball too." Treglia, 313 F.3d at 721-22. In Treglia, there was a genuine issue of material fact since the supervisor's denial of certain statements attributable to him were "an issue of credibility for the jury [to evaluate]." Id. at 721.

29

In <u>Frasure</u>, the defendant alleged that the plaintiff's employment was terminated due to: (1) her failure to comply with orders; (2) obscene language; (3) disrespectful conduct; (4) an attempt to inflict bodily harm to another; (5) inability to perform essential duties; (6) failure to provide requested medical information; and (7) unreasonable requests for accommodation. <u>Frasure</u>, 367 F. Supp. 2d at 257.  In satisfying the other prongs of a retaliation claim, the plaintiff in <u>Frasure</u> was able to defeat a motion for summary judgment by establishing that: (1) her employer was late in bringing conduct related issues to her attention; (2) she did in fact provide requested medical information; (3) her employer had sufficient medical records to provide her with the appropriate accommodations to perform the essential functions of her position for two preceding years; and (4) that she had not requested any accommodations other than the ones she had previously been receiving.  <u>Id.</u>

> *iv. The "But For" Standard of <u>Gross v. FBL Financial Services, Inc.</u> Does Not Apply to Saviano's ADA, Rehabilitation Act, and CFEPA Claims*

The Town attempts to equate the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), to the ADA in support of its argument that the holding in <u>Gross v. FBL Financial Services, Inc.</u>, 129 S.Ct. 2343 (2009), prohibiting the use of the motivating factor standard as a method of establishing unlawful discrimination under the ADEA, prohibits such use of the standard to establish ADA claims as well.  (Def.'s Mem. at 7-9, Doc. # 93-2)

The substantial difference in the ADEA and ADA language draws the opposite conclusion.  <u>Gross</u>, 129 S.Ct. at 2350 ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (citations omitted).

The ADEA prohibits certain discriminatory conduct "because of" an individual's age. 29 U.S.C. § 623(a)(1).  The ADA prohibits discrimination "because" an individual has opposed a discriminatory act. 42 U.S.C. § 12203(a).

The term "because of" and the word "because" do not have equivalent connotations.

The term "because of" is a preposition.  As a preposition, "because of" is followed by a noun phrase.  In the ADEA, this noun phrase, "an individual's age," is the prepositional complement.  Just as a prepositional complement is the object of its preposition, the noun phrase "an individual's age" is the object of the preposition "because of."  In <u>Gross</u>, the Supreme Court found the "ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." <u>Gross</u>, 129 S.Ct. at 2350.  The decision to act was based on age.  The term "because of" makes "age" the object of the "employer's decision to act."

The word "because" is a subordinating conjunction which introduces a dependent clause. The subordinating conjunction introduces the dependent clause and establishes the relationship between the independent clause and the dependent clause.  The relationship is not direct and inclusive.  In the ADA, the clause "such individual has opposed any act or practice made unlawful by this chapter" is the dependant clause and "no person shall discriminate against any individual" is the independent clause.

In <u>Gross</u>, the Court wrote that "Congress amended Title VII to allow for employer liability when discrimination 'was a motivating factor for any employment practice, even though other factors also motivated the practice' but did not similarly amend the ADEA." <u>Gross</u>, 129 S.Ct. at 2350 n. 3.  Therefore, the Court found that the ADEA did not allow for employer liability except when discrimination was the "but for" cause of the discriminatory practice.  Title

VII, however, is similar to the ADEA because it too uses the "because of" subordinating

conjunction and not the "because" preposition of the ADA.  Title VII of the Civil Rights Act of

1964 ("Title VII") prohibits employment practices that discriminate "because of" race, color,

religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  Congress amended Title VII  to

specifically establish discrimination "when the complaining party demonstrates that race, color,

religion, sex, or national origin was a motivating factor for any employment practice, even

though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  The Town draws the

conclusion that if Congress had intended to include a mixed-motive factor to the ADA, it would

have amended the ADA as it did Title VII, otherwise the ADA stands in the same position as the

ADEA, subject to the "but for" test.  (Def.'s Mem. at 9, Doc. # 93-2)

But Congress did not need to amend the ADA to include a mixed-motive factor for

establishing proof of discrimination.   The ADEA and Title VII use the "because of" term.  The

ADA does not.  The ADA was not amended to include a mixed-motive factor because it does not

use the term "because of" which necessitates such an amendment.

C.    Saviano and the Town Believed and Understood, Respectively,
      that Saviano filed the Union Grievances in Opposition to the Town's
      Discrimination Against Steven and the Town's Failure to
      Accommodate Steven's Disability

The plaintiff alleging retaliation "must adduce evidence sufficient to permit a rational

trier of fact to find" that (1) the plaintiff "engaged in protected participation or opposition under

Title VII," (2) "the employer was aware of this activity," (3) "the employer took adverse action

against the plaintiff," and (4) "a causal connection exists between the protected activity and the

adverse action … ."  Kessler v. Westchester Cty. Dept. of Social Servs., 461 F.3d 199, 205-206

(2d Cir. 2006).  The law protects employees in the filing of formal charges of discrimination as

well as informal protests, "including making complaints to management, writing critical letters to

customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Service., 899 F.2d 203, 209 (2d Cir. 1990). "Protected activity" refers to "action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).

The term "activity" encompasses a broader range of actions than written or oral statements. At all times relevant to Saviano's federal complaint in the instant matter, he served as President of Local 1303-194. When Saviano filed grievances on Steven's behalf following Steven's terminations in September, 1997, and July, 1999, the grievances claimed that the Town did not have just cause for its actions. When Steven failed to empty the trash in 1998, faced accusations of stealing co-workers' possessions in 1999, and used a racial slur in 2000, Saviano was involved in meetings addressing Steven's continued employment.

Saviano engaged in protected activity because he had a good faith, reasonable belief that he was opposing discrimination by filing the grievances on Steven's behalf. (Ex. 77, ADA Notes) (Ex. 37, Decision of Appeals Referee) (Ex. 55, CHRO Complaint) Saviano provided Farrell a document addressing prohibited conduct under the ADA. (Ex. 77, ADA Notes) He filed a complaint with the CHRO. (Ex. 55, CHRO Complaint)

>    i.  *Saviano's Immediate Supervisor Sought Steven's Termination*
>        *Instead of Accommodating Steven's Disability*

The record demonstrates that Rackliffe sought Steven's termination and was supported in his efforts by his direct supervisor, McCarthy. Rackliffe and McCarthy were unable to terminate Steven because, after Saviano filed grievances opposing Steven's termination, Steven remained employed. When Saviano was terminated, Rackliffe and McCarthy did not involve the Union in personnel decisions concerning Steven. (Ex. 1, Letter)

### a. *Steven's September 12, 1997, Termination*

The Town terminated Steven's employment on September 12, 1997, for "failing to report to work or to notify his supervisor of his absence on that date." (McCarthy Aff. ¶ 31, Doc. # 39) McCarthy supported Steven's September 12, 1997, termination because, "[a]lthough Steven is mentally disabled and could not operate an automobile, it was not the Town's responsibility to ensure that he [Steven] showed up for work on time on a regular basis." (McCarthy Aff. ¶ 31, Doc. # 39) McCarthy informed Steven in a letter of termination that Steven's "failure to report despite repeated warnings leaves the Town no alternative." (McCarthy Aff., Ex. J, Doc. # 39))

Saviano filed a grievance protesting Steven's termination. (McCarthy Aff. ¶ 31, Doc. # 39) The Town contacted the Connecticut State Bureau of Rehabilitation Services (BRS). (McCarthy Aff. ¶ 32, Doc. # 39) In consultation with BRS, the Union, and Steven's mother, "a back up support plan was developed to ensure that Steven came to work or if absent that he or his mother called in to report his absences … ." (McCarthy Aff. ¶ 33, Doc. # 39.) The Town then "decided to give Steven one final chance to come to work on a regular basis and reinstated him effective March 1, 1998, without back-pay under a 'last chance' agreement." (McCarthy Aff. ¶ 33, Doc. # 39)   None of these accommodations would have occurred but for the grievances that Saviano filed on Steven's behalf.

### b. *Steven's Five (5) Day Suspension for May 27, 1999, Stealing Accusation*

Rackliffe reported to McCarthy that Steven had stolen a co-worker's wallet and pack of cigarettes on May 27, 1999. (McCarthy Aff. ¶ 37, Doc. # 39) In his memorandum to McCarthy, Rackliffe said: "I personally find this behavior distasteful to the extreme!  I can find no room for tolerance for thievery.  I recommend, in the strongest possible terms, that the Town move to terminate Steven." (McCarthy Aff., Ex. M, Doc. # 39)  However, the Town did not terminate

Steven and instead suspended him for two weeks because it "felt that Steven's judgment was impaired due to his mental disability … ."  (McCarthy Aff. ¶ 37, Doc. # 39)  But for Saviano's intervention through filing a grievance, Steven would have been terminated.

### c.  Steven's July 16, 1999, Termination

McCarthy terminated Steven on July 16, 1999, for his "excessive unauthorized failures to report to work for scheduled overtime without notifying his supervisor that he would be absent." (McCarthy Aff. ¶ 38, Doc. # 39) (McCarthy Aff., Ex. P, Doc. # 39)  Saviano filed a grievance alleging that the Town lacked just cause under the CBA to terminate Steven.  (McCarthy Aff. ¶ 39, Doc. # 39)  The First Selectwoman informed McCarthy that the Town intended to assist Steven so that he could return to work.  (McCarthy Aff. ¶ 40, Doc. # 39)  Farrell was aware that Steven was mentally impaired and directed McCarthy and Rackliffe "to make every possible effort to accommodate Mr. Welch to make his employment with the Town successful." (Affidavit of Diane Goss Farrell (hereinafter, "Farrell Aff.") ¶ 11, Doc. # 35)

Farrell, McCarthy, the Town's Personnel Director Thomas Hamilton, Steven's mother, Saviano, representatives from STAR, Inc., the Kennedy Center and the Connecticut State Department of Mental Retardation, attended a meeting to discuss Steven's issues so that he could return to work and report as required.  (McCarthy Aff. ¶ 41, Doc. # 39.)  Saviano, Hamilton, James Castelot from AFSCME, and Steven's mother then drafted a letter of agreement that reinstated Steven to his position effective November 1, 1999.  (McCarthy Aff. ¶ 42, Doc. # 58.)

### d.  Pre- and Post-Saviano Termination Union Involvement in Steven's Employment

Approximately one month after Steven's March 1, 1998, reinstatement, Steven did not empty the trash.  (McCarthy Aff. ¶ 35, Doc. # 39)  On October 10, 1998, Steven failed to report to work or call.  (McCarthy Aff. ¶ 36, Doc. # 39)  The Union grieved each incident.  A letter

regarding Steven's failure to report to work on October 10, 1998, was distributed to Saviano. (McCarthy Aff., Ex. L, Doc. # 39)  A letter from the Town's Personnel Director to Steven's mother scheduling a September, 2000, meeting was distributed to Saviano.  (McCarthy Aff., Ex. T, Doc. # 58.)  Saviano attended the September 25, 2000, meeting to discuss with the Town "Steven's behavior over the last year and to explore possible remedies."  (McCarthy Aff., Ex. U at 1, Doc. # 39)  At the meeting, "Stuart McCarthy and Dan Rackliffe also described a deterioration in Steven's work performance, the increased frequency of his wondering [sic] off, the need for increased supervision and direction and obvious resentment, and the overall impression they have that he is no longer happy in his job."  (McCarthy Aff., Ex. U at 2, Doc. # 39.)

Following Saviano's termination, the Union was not involved in Steven's employment decisions.  (McCarthy Aff., Ex. W, Doc. # 39) (McCarthy Aff., Ex. X, Doc. # 39) (McCarthy Aff., Ex. Z, Doc. # 39)  No Union member attended a meeting held on February 5, 2003, to discuss concerns regarding Steven's job.  (McCarthy Aff., Ex. X at 1, Doc. # 39)  Rackliffe attended the February 5, 2003, meeting.  (McCarthy Aff., Ex. X at 1, Doc. # 39)  The Town's personnel department and McCarthy effectuated a disability retirement for Steven as outlined in a letter dated August 5, 2003, to McCarthy.  (McCarthy Aff., Ex. Z, Doc. # 39)  The Union is not mentioned as a factor in the disability retirement decision or as a resource for Steven.  Despite the statements by Rackliffe and McCarthy that their purpose was to support Steven on the job, their previous efforts to terminate Steven, Rackliffe's comparison of Steven to an albatross, and the fact that after Saviano left his employment Steven followed with a disability retirement, demonstrate that Saviano's grievances and their effect on the Farrell while Saviano was

employed by the Town were the only barrier to Rackliffe's and McCarthy's efforts to terminate Steven.

### ii. Saviano's Immediate Supervisor Refused to Accommodate Steven Once Saviano was Terminated

Saviano's Union grievances filed on behalf of Steven cannot be disassociated from the Town's willingness, through the First Selectwoman, to accommodate Steven. A causal connection existed between the grievances and the First Selectwoman's accommodations for Steven. The First Selectwoman, knowing that Steven was disabled, responded to the grievances by accommodating Steven's disability.

The CBA between the Union and the Town did not contain an anti-discrimination clause. (McCarthy Aff., Ex. A, Doc. # 39)  However, Rackliffe, McCarthy, the First Selectwoman, and Saviano all knew and understood that Steven remained employed because Saviano filed grievances. See Def.'s Supp., Ex. A at 7, Doc. # 71 (The Town's attorney stated at the December 2, 2002, Board hearing: "Suspended in July of 1999 related to the Steven suspension. Steven being the handicapped person. To his assistance he [Saviano] did come, admittedly."). Selectwoman Farrell recognized that Steven was disabled and required accommodations to keep his position. Saviano continued to file grievances because he was the Union President, was familiar with filing grievances on the behalf of Union members, and had managed to help Steven keep his job. Farrell's response to Saviano's grievances was to accommodate Steven. She knew that Saviano filed the grievances in opposition to discriminatory treatment of Steven otherwise her responses to the grievances, specifically, to accommodate Steven, would not have been reasonable responses.

But for Saviano, Rackliffe and McCarthy would have terminated (or retired) Steven in 1997 without the Union's interference or involvement.[9] (Hanson Aff. ¶ 5, Doc. # 36) ("The choice of retirement was one reached with Steven Welch and his family and one that the Town accepted of good terms.") But for Saviano, Rackliffe and McCarthy would have terminated (or retired) Steven without the First Selectwoman's interference or involvement. (Farrell Aff., Doc. # 35) The First Selectwoman's affidavit in support of summary judgment does not reference Steven's retirement and the letters circulated regarding the retirement and the meeting notes of February 5, 2003, do not reference the Union or the First Selectwoman. (McCarthy Aff., Ex. W, Doc. # 39) (McCarthy Aff., Ex. X, Doc. # 39) (McCarthy Aff., Ex. Z, Doc. # 39) Once Saviano was terminated, the chain of opposition to discrimination that ran through Saviano's grievances to the First Selectwoman was broken and plans for Steven's separation from employment soon followed.

D.   A Causal Connection Exists Between Saviano's Administrative Complaint and the Town's Decision to Suspend and Terminate Saviano

The filing of the CHRO complaint in August, 2001, and its dismissal during Saviano's worker's compensation leave for jurisdictional reasons ensured that when Saviano returned to work on July 8, 2002, Rackliffe and McCarthy would share the opinion expressed by the Town's attorney at the Board hearing that the Town did not need to be concerned with its efforts to terminate Saviano and Steven because the CHRO complaint was gone and efforts to rid Longshore of Saviano and Steven could proceed unimpeded. The fact that the CHRO complaint had been filed and dismissed did not discourage Rackliffe and McCarthy, it only emboldened

---

[9] Steven was a member of the Union.  See (Affidavit of Daniel Rackliffe (hereinafter, "Rackliffe Aff.") ¶ 4, Doc. # 40) ("At all material times until his disability retirement in November 2003, Steven Welch ("Welch") was employed by the Town as a laborer working at the Longshore Golf Course and he was a member of Local 1303-194 of Council #4 AFSCME.").

them in their efforts to terminate Saviano.  The time period between Saviano's filing of the

CHRO complaint in August, 2001, and the Board meeting on December 2, 2002, is not the

relevant period for determining the proximity of a causal connection, although it is proximate

enough given the continuity of discriminatory conduct on the parts of Rackliffe and McCarthy as

memorialized in their own logs and by their conduct.  Saviano returned to work on July 8, 2002,

following the dismissal of his CHRO complaint.  Rackliffe's memoranda to McCarthy and the

investigation into Rackliffe's allegations of sabotage immediately followed.

      E.      <u>The Second Circuit did not Incorrectly State that the Town had Conceded
            Protected Activity</u>

In the Defendant's Request to File Supplement Reply Re: Oral Argument ("Request"),

the Town acknowledged:

> The mention of the CHRO charge filed by the plaintiff in August
> 2001 at the termination hearing on December 2, 2002, shows that
> the board of selectmen had knowledge that the plaintiff had
> participated in that alleged protected activity, but it does not create
> a genuine issue of material fact as to whether there was any causal
> connection between the protected activity and the adverse decision
> as required to make out a prima facie case of retaliation under the
> ADA.

(Def.'s Request at 4, Doc. # 71)  The Second Circuit noted:

> Westport submitted a transcript of the December 2, 2002, Board of
> Selectmen hearing during which an attorney for the town observed
> that Saviano had field a disability discrimination charge in August
> 2001 and explicitly notified the town that Saviano might challenge
> any effort to terminate him as retaliation for having done so.

(Ex. 87, <u>Saviano v. Town of Westport</u>, 07-1174-cv (2d. Cir. 2009), Summary Order at 3-4)  The

Appellate Court then found that the Town, in its Request, had "conceded that this evidence

demonstrated both protected activity and Westport's knowledge thereof, and the Town asserted

only that Saviano failed to demonstrate a causal connection between this activity and the

termination." (Ex. 87, Summary Order at 4)  In its Memorandum, the Town disputes the finding

of the Appellate Court that the Town conceded protected activity in its Request and directs this

Court to footnote 5 of the Request.  (Def.'s Mem. at 6, Doc. # 93-2) (Def.'s Request at 4 n. 5,

Doc. # 71)  Footnote 5 of the Request states:

> For the reasons set forth in the defendant's memorandum of law in
> support of its summary judgment motion, the filing of the CHRO
> complaint was not an activity protected by the ADA because the
> plaintiff's subjective belief that the Town discriminated against Mr.
> Welch in violation of the ADA was not reasonable based on the
> totality of the circumstances.  (Defendant's supporting
> memorandum, pp. 11-18)

Saviano responds that the totality of the circumstances described through this memorandum and

its exhibits support not only a subjective belief, but an objective opinion by the trier of fact that

the Town did engage in unlawful disability discrimination against Steven.

**IV.     CONCLUSION**

For the foregoing facts and arguments of law, Saviano respectfully asks the Court to deny

the Town's Motion for Summary Judgment on Remand in its entirety.


                                        PLAINTIFF
                                        JOSEPH J. SAVIANO, JR.


                              BY:     /s/ Rachel M. Baird
                                      Rachel M. Baird (ct12131)
                                      Law Office of Rachel M. Baird
                                      379 Prospect Street
                                      Torrington CT 06790-5238
                                      Tel: (860) 626-9991
                                      Fax: (860) 626-9992
                                      Email: rbaird@rachelbairdlaw.com

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY THAT on March 5, 2010, a copy of the foregoing Plaintiff's

Memorandum of Law in Opposition to Motion for Summary Judgment on Remand was filed

electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


/s/ Rachel M. Baird
Rachel M. Baird (ct12131)
Law Office of Rachel M. Baird
379 Prospect Street
Torrington CT 06790-5238
Tel:  (860) 626-9991
Fax:  (860) 626-9992
Email:  rbaird@rachelbairdlaw.com

# APPENDIX A

## OUTLINE OF MEMORANDUM

**I.   SUMMARY**

**II.  FACTS**
    A.   Steven Welch's 1997 Termination and 1998 Return to Work
    B.   Saviano's Suspension and Steven Welch's Termination and Reinstatement in 1999
    C.   Steven Welch's 2000 Suspension and Saviano's Grievances
    D.   Rackliffe's Increased Hostility, Saviano's Worker's Compensation Leave, Suspension and Termination in 2001-2002
    E.   Steven Welch's Retirement in 2003
    F.   Saviano's Work Performance, Record, and Rackliffe's and McCarthy's Secret Logs
         i.    *Personnel Evaluations*
         ii.   *The Temporal Connection Between Saviano's Protected Activity and the Cessation of Formal Evaluation of Saviano's Performance*
         iii.  *The Secret Logs Prepared to Document Cause for Saviano's Termination Contain Inconsistencies and Unwarranted Subjective Conjecture*
    G.   Rackliffe and McCarthy Disapproved Of and Retaliated Against Saviano for Protecting Steven's Rights
    H.   Rackliffe and McCarthy Purposefully, Maliciously, Intentionally and With Retaliatory Intent Provoked Saviano Into the Alleged Actions They Then Used to Justify Saviano's Suspension and Termination

**III. ARGUMENTS OF LAW**
    A.   Standard for Summary Judgment
    B.   Federal and State Retaliation Claims
         i.    *Claims Under The ADA Are Analyzed In The Same Manner as Title VII Cases*
         ii.   *Prime Facie Retaliation*
             1.   Defining a Protected Activity Known to a Defendant
             2.   Defining an Adverse Employment Action
             3.   Defining Causal Connection
         iii.  *The Burden Shift and the Definition of Pretext in Retaliation Cases*
         iv.   *The "But For" Standard of* <u>*Gross v. FBL Financial Services, Inc.*</u> *Does Not Apply to Saviano's ADA, Rehabilitation Act, and CFEPA Claims*
    C.   Saviano and the Town Believed and Understood, respectively, that Saviano field the Union Grievances in Opposition to the Town's Discrimination Against Steven and the Town's Failure to Accommodate Steven's Disability
         i.    *Saviano's Immediate Supervisor Sought Steven's termination Instead of Accommodating Steven's Disability*
         ii.   *Saviano's Immediate Supervisor Refused to Accommodate Steven Once Saviano was Terminated*
    D.   A Causal Connection Exists Between Saviano's Administrative Complaint and the Town's Decision to Suspend and Terminate Saviano
    E.   The Second Circuit did not Incorrectly State that the Town had Conceded Protected Activity

**V.   CONCLUSION**