UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSEPH SAVIANO, JR.,            :

   Plaintiff,                   :

V.                              :    CASE NO. 3:04-CV-522(RNC)

TOWN OF WESTPORT,               :

   Defendant.                   :

<u>RULING AND ORDER</u>

Plaintiff Joseph Saviano, Jr. brings this action against his
employer, the Town of Westport, claiming principally that the
Town took retaliatory actions against him in violation of the
Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, et
seq.  This Court previously granted the defendant's motion for
summary judgment.  The Court of Appeals remanded for
reconsideration upon further development of the record.  Since
then, an amended complaint has been filed and answered and the
parties have engaged in more discovery.  The case is now before
me on a new motion for summary judgment by the Town.  Viewing the
current record fully and most favorably to the plaintiff, I
conclude that the evidence is marginally sufficient to enable him
to avoid summary judgment.  Accordingly, the motion for summary
judgment on remand is denied.

I. Summary Judgment

Summary judgment may be granted when there is no genuine
issue of material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In seeking summary judgment, a defendant has the initial burden of showing that there is an absence of evidence to support an essential element of the plaintiff's claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  To overcome this showing, a plaintiff must point to evidence that would permit a jury to return a verdict in his favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If he cannot do so, summary judgment is proper, even in a discrimination case.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)(salutary purposes of summary judgment apply no less to discrimination cases than to other areas of litigation).  In determining whether summary judgment is proper, the record must be viewed in the light most favorable to the plaintiff.  See Sheppard v. Beerman, 317 F.3d 351, 354 (2d Cir. 2003).  This requires the court to resolve all ambiguities and draw all permissible inferences in favor of the plaintiff.  See Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997).  However, conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact for trial.  Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

II. Background

The following facts are either undisputed, or, where

disputed, taken in the light most favorable to the plaintiff. Plaintiff's employment with the Town began in 1977.  At all times relevant to this motion, he was the Assistant Superintendent of Greens at the Town's municipal golf course.  He was also the president of Local 1303-194, Council 4, AFSCME.  Plaintiff reported to Dan Rackliffe, Superintendent of Greens.  Rackliffe in turn reported to Stuart McCarthy, Director of the Town's Parks and Recreation Department.  Beginning in 1997, McCarthy reported to First Selectwoman Diane Farrell.

One of plaintiff's subordinates, Steven Welch, had a mental disability.  Rackliffe and McCarthy viewed Welch as an undesirable employee and sought to have him removed.  In 1997, Welch was terminated for excessive absenteeism.  In 1998, after the State of Connecticut and an outside support group became involved, Welch was re-hired on a "last chance" basis.  He was subsequently disciplined for failing to complete an assigned task (emptying trash cans) and for stealing small items from co-workers.[1]

In July 1999, Welch was suspended and subsequently terminated for accumulating unauthorized absences.  First

---

[1] Plaintiff stated in his deposition that he believes McCarthy was looking for reasons to discipline Welch and did not discipline other employees for similar deficiencies.

Selectwoman Farrell became involved and directed her subordinates to work to accommodate Welch's disability.  Farrell supervised an agreement under which Welch was reinstated with special conditions.  He was also provided with a job coach by the Kennedy Center, a non-profit organization.

Despite these steps, Welch's conduct on the job continued to deteriorate.  In July 2000, he directed a racial slur at a co-worker and was suspended as a result.[2]  Farrell informed the plaintiff that she viewed the use of racial slurs as a serious offense and would have terminated Welch were it not for his mental disability.  Later that year, Farrell sought and received additional aid for Welch from the State.

Welch's conduct on the job continued to decline.  His co-workers grew increasingly impatient and even hostile.   He voluntarily took disability retirement on November 3, 2003.

Plaintiff frequently stood up for Welch.  When Welch was disciplined, plaintiff filed a grievance on his behalf. Plaintiff chastised his subordinates when they made fun of Welch. He complained about their conduct to Rackliffe and McCarthy, but they took no action.  He also complained that Welch was held to a

---

[2] Plaintiff alleges in his deposition that Rackliffe never reprimanded Welch's co-workers for using inappropriate slurs directed at his mental disability.

stricter standard than other employees.  He testified on Welch's behalf at an unemployment benefits appeal hearing.  At various points, he spoke with Farrell on Welch's behalf and was involved in her attempts to accommodate him.  He sent Farrell an article that dealt with workplace harassment in retaliation for anti-discrimination complaints.  In 2001, he filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that he was being harassed in part because of his efforts on behalf of a person protected by the ADA.

Starting in about 1998, plaintiff and Rackliffe had an extremely contentious relationship.[3]  Plaintiff asserts that Rackliffe treated him differently than other employees, required him to do undesirable and menial work that he had not previously done, and undermined his position as a supervisor by sowing unrest among his subordinates.  Rackliffe submitted negative reports regarding the plaintiff and continually stated his wish that plaintiff be fired.  He frequently reported his fear that plaintiff might turn violent.  He eventually stopped writing performance evaluations of plaintiff, stating that they would be of no use.

---

3 The record indicates that plaintiff did not have any serious employment issues or any problems with Rackliffe or McCarthy prior to 1997.

In August 2002, Rackliffe returned from vacation to find the golf course in poor condition.  He accused plaintiff of intentional sabotage.  Farrell appointed a neutral, three-member committee to investigate.  The committee found insufficient evidence of sabotage.  However, it found that plaintiff was no longer adequately performing his duties and was ineffective as a supervisor because he had alienated his co-workers and Rackliffe. It recommended that he be demoted to a non-supervisory position and transferred to another post.

On September 17, 2002, the day the committee's report was received, the plaintiff stated to Rackliffe that he would only respect him when Rackliffe "stopped treating [plaintiff] like [his] little nigger."[4]  Plaintiff repeated this statement three more times during a subsequent meeting with a Union representative despite Rackliffe's admonitions to stop.  On October 7, McCarthy sent Farrell a letter recommending that plaintiff be terminated for his use of racial slurs and insubordinate conduct.

On October 17, 2002, Farrell wrote a letter informing plaintiff of his termination.  The letter provided seven reasons:

---

[4] Plaintiff maintains that Rackliffe was the first to use the "n-word."  Plaintiff made this claim for the first time in an affidavit submitted with his opposition to the motion for summary judgment and did not mention it in his deposition.

(1) he failed to conduct himself in a professional and cooperative manner, which was disruptive and resulted in an unproductive work environment, (2) he had been cautioned about his conduct repeatedly, (3) he was no longer effective in performing supervisory duties required of his position, (4) he had demonstrated his unwillingness to perform tasks assigned to him, (5) he had been insubordinate to his supervisor, (6) he had repeatedly made racial slurs after being told such language would not be tolerated, and (7) he no longer had the confidence of the Department Director that his work would be productive and in the best interests of the Town.

On December 2, 2002, a termination hearing was held. Plaintiff presented evidence to the Board of Selectmen ("the Board"), and the Town's attorney informed them of the 2001 CHRO complaint.  The Board voted unanimously to uphold the termination.

On December 5, 2002, the Union filed a grievance on plaintiff's behalf challenging his termination.  The State Board of Mediation and Arbitration ("SBMA") stayed the grievance proceeding on April 14, 2004, as a result of this lawsuit.  On April 29, 2004, plaintiff filed a CHRO complaint alleging that the SBMA had stayed his grievance in retaliation for his previous CHRO complaint.  On June 23, 2004, James Castelot, the Union

representative, wrote a letter to the SBMA requesting that the stay be lifted.  The Town did not object.

The SBMA subsequently appointed a different panel and heard the grievance.  On March 15, 2006, it issued its award.  It found that plaintiff had not been terminated for just cause because he had not been progressively warned about his conduct.  It did not view his repeated use of the "n-word" as sufficient in itself to end his long career.  It converted his termination into a suspension without pay, and ordered him reinstated but demoted to a non-supervisory position.  The panel noted that, "in light of the fact that he was the architect of a considerable portion of his difficulty, and has been receiving pension benefits as a result of his retirement, no award of back pay or other make whole provisions are warranted."

Believing he was entitled to additional back benefits, plaintiff moved unsuccessfully to vacate this award.  He then filed a new grievance seeking to force the Town to comply with the award.  On March 25, 2008, a different SBMA panel found that the award did not require the payment of any additional benefits, and that the Town had therefore fully complied with it.  As such, res judicata barred the new grievance.  Plaintiff's attorney, Rachel M. Baird, then sent a letter to Town Personnel Director Thomas Hamilton stating that the payments received after

plaintiff's termination should be treated as wages rather than pension benefits because plaintiff had never submitted a valid request for benefits (his only submission having been deficient). The Pension Boarded voted 4-1 to deny this request, with one member abstaining.

III. Discussion

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. 12203(a).  The McDonnell Douglas burden shifting framework applies to retaliation claims brought pursuant to this section of the ADA.  Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).[5]  In order to establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in ADA-protected activity; (2) his employer was aware of this

---

[5] The Supreme Court's recent decision in Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009), discussed further infra, could portend the application of a different framework to ADA cases.  However, the Second Circuit has indicated that the McDonnell Douglas analysis should be applied until the Supreme Court determines otherwise.  See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) (despite Gross, McDonnell Douglas framework still applies to ADEA case with caveat that demonstrating pretext now requires plaintiff to show that discrimination was a but-for cause of the adverse action).

activity; (3) the employer took adverse employment action against

him; and (4) a causal connection exists between the adverse

action and the protected activity.  Id.  If the plaintiff meets

this burden, the defendant must provide a legitimate rationale

for the adverse action.  The burden then shifts back to the

plaintiff to demonstrate that the proffered rationale is a

pretext.  Id. at 721.[6]

The plaintiff has submitted sufficient evidence to allow a

reasonable jury to conclude that he engaged in protected activity

and that Rackliffe and McCarthy were aware of it.  A person

engages in protected activity when he opposes an action outlawed

by the ADA.  Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170,

1178 (2d Cir. 1996).  He need not establish that the employer's

conduct actually violated the ADA, but must demonstrate a good

faith, reasonable belief that it did.  Treglia, 313 F.3d at 719.

Protected complaints need not be formal.  Sumner v. United States

Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).  Nor do they

have to be direct or specific.  See Hubbard v. Total

Communications, 347 Fed. Appx. 679, 681 (2d Cir. 2009) (email to

supervisor sarcastically noting that "10-12 guys/technicians"

received raises was sufficient to constitute complaint of

_____

6 The parties agree that plaintiff's other claims - brought
pursuant to the Rehabilitation Act and the Connecticut Fair
Employment Practices Act - are analyzed using this same
framework.

differential treatment based on gender).

Taking the record in the light most favorable to the plaintiff, Rackliffe and McCarthy sought to fire Welch from at least 1997.  The evidence creates a genuine issue of fact as to whether they sought Welch's termination because of his disability.  A genuine issue of fact also exists with regard to whether they viewed the plaintiff as an obstacle to Welch's termination  because of his formal and informal protests on Welch's behalf.  Plaintiff states in his affidavit that Welch was harassed by his co-workers, that he complained of this conduct to Rackliffe and McCarthy, and that they did nothing.  See Pl.'s Aff. ¶¶ 15, 20.  He further alleges that Rackliffe made unusual efforts to find deficiencies in Welch's performance.  Id. ¶¶ 22-24.  In a memo to McCarthy, Rackliffe wrote of Welch: "It isn't bad enough that we are saddled with a sub-par performer, but does the Town really need to have its face rubbed in it as well?"  A jury could conclude that Rackliffe's description of Welch as a sub-par performer was a veiled reference to his disability and that his complaint of having the Town's face "rubbed in it" was a reference to Saviano's grievances and other efforts.[7]

There are weaknesses in the plaintiff's evidence.  He does not

---

[7] Rackliffe made other disparaging comments about Welch, such as referring to him as an "albatross around the Town's neck."  A reasonable jury could infer that these comments also were references to Welch's mental disability.

11

allege that he ever specifically stated to his supervisors that they were unlawfully discriminating against Welch because of his disability.  The grievances he filed on Welch's behalf alleged violations of the Union's collective bargaining agreement and did not specifically mention discrimination.[8]  He submitted an article about the ADA to Farrell, but did not provide any explanation or context.[9]  And his CHRO complaint alleges

---

[8] Grievances are not generally considered protected activity when they fail to mention discrimination.  See Melie v. EVCI/TCI College Admin., 374 Fed. Appx. 150, 153 n.* (2d Cir. 2010); Lewis v. Conn. Dep't of Corr., 355 F. Supp. 2d 607, 617-18 (D. Conn. 2005).  Plaintiff argues that, due to the context of these grievances, the Town was aware that they constituted protests of discrimination against Welch.  He further points out that Welch's mental disability led to many of the actions for which he was disciplined (such as failure to report for work and delinquency in completing tasks).  By alleging that the discipline lacked just cause, he may have been implicitly arguing that they were inconsistent with reasonable accommodations necessary for Welch's disability.  Taken alone, these grievances would not be sufficient to constitute protected activity.  Given the overall context, however, a reasonable jury could infer that they were complaints of discrimination.

[9] A handwritten note at the top of the first page says "FYI" and "Sent from Joe S."  The article states that it is unlawful for employers to retaliate against employees who protest discrimination.  It discusses the need to establish adequate complaint procedures.  This evidence is also problematic because plaintiff has not alleged that Farrell had any discriminatory motive in terminating him.  Instead, he bases his claim on a "cat's paw" theory, in which Rackliffe and McCarthy manipulated Farrell.  Plaintiff has not cited any evidence that McCarthy or Rackliffe was aware of the ADA article submitted to Farrell.  As such, it is not sufficient to constitute an instance of protected activity and is only relevant insofar as it shows the understanding on the part of plaintiff and of the Town generally that Welch was protected by the ADA and required special accommodation.

retaliation for previous efforts on behalf of Welch rather than specific discrimination against him.[10]  Each of these actions would likely be insufficient on its own to constitute protected activity.  However, taken together in the broader context of the relationship between plaintiff, Welch, and the Town, a reasonable jury could infer that plaintiff had a good faith, reasonable belief that he was protesting illegal discrimination against Welch and that Rackliffe and McCarthy shared this understanding.[11]

The record is also sufficient to establish an adverse employment action.  In the employment context, an action is adverse if it is harmful to the point that it could dissuade a reasonable worker from making or supporting a charge of discrimination.  Platt v. Incorporated Village of Southampton,

---

10 It is also dubious whether the CHRO complaint on its own would be sufficient to establish a prima facie case.  It was filed in 2001.  According to plaintiff's theory of the case, Rackliffe and McCarthy began a campaign to terminate him starting in 1997.

11 Defendant also argues that none of the actions taken against Welch violated the ADA but plaintiff has submitted enough evidence to allow a jury to conclude that he reasonably believed Welch was the victim of unlawful discrimination.  Plaintiff alleges that Rackliffe and McCarthy applied inconsistent standards to Welch and disciplined him when they would not have disciplined a non-disabled employee.  He claims that they sought to terminate him on the basis of his disability and took unusual actions toward that goal.

391 Fed. Appx. 62, 64 (2d Cir. 2010) (citing <u>Hicks v. Baines</u>, 593 F.3d 159, 165 (2d Cir. 2010)).  Minor inconveniences are not actionable.  <u>Hicks</u>, 593 F.3d at 165.  Plaintiff was terminated in October 2002.  He was subsequently reinstated by the SBMA, but demoted to a non-supervisory position and transferred to another area within the Department.  A demotion is sufficiently harmful to dissuade a reasonable worker from protesting discrimination.[12]

The record also contains sufficient evidence of a causal connection between plaintiff's protection of Welch and his termination.  Causation is generally established by temporal proximity between the protected activity and the adverse employment action.  If a substantial amount of time elapses between the two actions, temporal proximity is not sufficient on

---

[12] In his opposition to summary judgment, plaintiff suggests two other adverse actions.  He alleges that the Town improperly refused to treat his post-termination benefits as wages rather than retirement benefits once he was reinstated, and that the SBMA stayed his grievance proceeding at the request of the Town in retaliation for having filed this lawsuit.  Plaintiff mentions these actions in his statement of facts, but does not mention them in his argument.  Neither of these actions was materially adverse.  The SBMA did not issue any award that would convert the benefits to wages.  Its decision specifically stated that the plaintiff should not receive back pay or other "make whole" provisions.  With regard to the stay of plaintiff's grievance proceeding, the record indicates that it was stayed for only two months.  At that point, the plaintiff requested that the stay be lifted and the Town consented.  There is no evidence that the Town actively pursued the stay in the first place.

its own to establish causation.  <u>Clark County School Dist. v.</u>
<u>Breeden</u>, 532 U.S. 268, 274 (2001) (lapse of 20 months does not
suggest causality).  However, corroborating evidence can support
an inference of causation even when there is a substantial lapse.
<u>Neron v. Cossette</u>, 419 Fed. Appx. 123, 124 (2d Cir. 2011).

    According to plaintiff's theory of the case, his termination
was not a spontaneous action, but rather the culmination of a
long campaign by Rackliffe and McCarthy.  He alleges that he took
numerous actions from 1997 to 2001 to protest discrimination
against Welch.  Rackliffe sought to have him terminated as early
as 1997, and continued to take actions toward this goal until
plaintiff was eventually fired.  There is thus sufficient
evidence for a reasonable jury to conclude that Rackliffe's
actions were caused by plaintiff's protected activity.

    The plaintiff having established a prima facie case, the
burden shifts to the defendant to provide a legitimate, non-
discriminatory explanation for his demotion and transfer.
Defendant cites the reasons listed by Farrell in her letter:
plaintiff was ineffective as a supervisor, insubordinate, did not
get along with his co-workers, and repeatedly used a racial slur.
Defendant points out that an independent committee determined
that plaintiff was ineffective and insubordinate, and that
Farrell's decision was upheld by the neutral board of selectmen.

Though the defendant's proffered reason has substantial support in the record, the plaintiff has provided sufficient evidence to allow a reasonable jury to conclude that the explanation is pretextual.  As a threshold matter, there is some ambiguity as to the plaintiff's burden of persuasion.  In Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343 (2009), the Supreme Court held that the Age Discrimination in Employment Act ("ADEA") requires a plaintiff to prove that age discrimination was the "but-for" cause of the adverse action.[13]  The Court noted that whereas the language of Title VII outlaws adverse action when discrimination is a "motivating factor," the ADEA's text prohibits adverse action "because of" age discrimination.  Id. at 2350, 2352 n.5.

Though it construed the ADEA, Gross has implications for ADA retaliation claims as well.  The Seventh Circuit has read Gross

13 Prior to Gross, the Second Circuit analyzed ADA claims under the framework established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  See Serwatka v. Rockwell Automation, 591 F.3d 957, 959-61 (7th Cir. 2010) (describing history of ADA mixed-motive claims); Parker v. Columbia Pictures, 204 F.3d 326, 336-37 (2d Cir. 2000) (holding that Price Waterhouse principles extend to ADA claims).  Under Price Waterhouse, once the plaintiff had presented substantial evidence of discrimination, the burden shifted to the defendant to show that it would have made the same decision in the absence of the discriminatory motive.  This allowed for a "mixed-motive" claim, in which a plaintiff showed that discrimination was one cause of adverse action without providing evidence that it was determinative.  In Gross, the Court foreclosed such claims, holding that the plaintiff must prove by a preponderance of the evidence that he would not have suffered the adverse action but for unlawful discrimination.

broadly to mean that any antidiscrimination statute with the
"because of" construction used in the ADEA requires a plaintiff
to establish but-for causation.  See Serwatka v. Rockwell
Automation, 591 F.3d 957, 961 (7th Cir. 2010) ("Although the
Gross decision construed the ADEA, the importance that the court
attached to the express incorporation of the mixed-motive
framework into Title VII suggests that when another anti-
discrimination statute lacks comparable language, a mixed-motive
claim will not be viable under that statute.").  The Second
Circuit has not addressed whether Gross controls ADA claims.  See
Bolmer v. Oliveira, 594 F.3d 134, 148-49 (2d Cir. 2010) (noting
without deciding that Gross may require but-for causation in
Title II context).  However, several district courts have applied
Gross in the ADA context.  See Warshaw v. Concentra Health
Servs., 719 F. Supp. 2d 484, 503 (E.D. Pa. 2010); Ross v.
Independent Living Resource of Contra Costa County, No. C08-00854
TEH, 2010 WL 2898773, at *6 (N.D. Cal. July 21, 2010).  But see
Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324, 343
n.40 (S.D.N.Y. 2010) (stating that because the Supreme Court did
not specifically find the but-for standard required under the
ADA, Second Circuit mixed-motive caselaw still governs, while
noting that the plaintiff had also satisfied the but-for
standard).

17

The retaliation provision of the ADA contains essentially the same relevant language as the ADEA.[14]  Accordingly, I find that the but-for causation standard enunciated by the Supreme Court in Gross applies in the ADA retaliation context.  Plaintiff therefore bears the burden of proving by a preponderance of the evidence that were it not for his protests of discrimination against Welch, he would not have been demoted and transferred. This does not mean, however, that he is required to establish retaliation was the sole reason for his termination.  See Everson v. Leis, No. 09-4355, 2011 WL 463231, at *13 n.8 (6th Cir. Feb. 10, 2011).

Plaintiff seeks to demonstrate pretext by relying on a "cat's paw" theory of liability.  In a cat's paw scenario, a non-decisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking action against the plaintiff.  See Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011); see also

---

14 It states that an employer cannot "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. 12203(a) (emphasis added).  Plaintiff's argument that there is a material grammatical difference between the use of "because of" in the ADEA and "because" in the ADA is unavailing. The language is essentially the same and conveys the same meaning.  See Warshaw, 719 F. Supp. 2d at 503 ("Thus, just as 'because of'-which is defined as 'by reason of,' . . . calls for 'but-for' causation, so too does the unadorned 'because' in § 12203(a).")

Brown v. Connecticut, No. 3:08-cv-1478, 2010 WL 2220580, at *12 (D. Conn. May 27, 2010).[15]  Here, plaintiff alleges that his discriminatory supervisors, Rackliffe and McCarthy, made false and damaging reports to Farrell, leading her to believe he was unstable and insubordinate.  He further claims that Rackliffe sowed unrest among his subordinates, rendering him ineffective as a supervisor.[16]  Applying the Gross standard, plaintiff must establish that but for the actions of his supervisors, he would not have been terminated.[17]

The evidence is sufficient for a reasonable fact finder to conclude that the actions of Rackliffe and McCarthy were the but-for cause of plaintiff's termination.  Six of the seven reasons

---

[15]  The Second Circuit has never formally recognized this theory. See Hogan v. J.P. Morgan Chase Bank, 402 Fed. Appx. 590, 593 n.3 (2d Cir. 2010).  But it has held that bias at any stage of a decision process can taint the ultimate decision in violation of Title VII.  Bickerstaff v. Vassar College, 196 F.3d 435, 450 (2d Cir. 1999).

[16] Plaintiff does not allege that Farrell or the Board of Selectmen had any discriminatory motive in deciding to terminate him.

[17] In Staub, the Supreme Court held that a cat's paw liability claim under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA) requires only that the conduct of the discriminatory supervisor be a proximate cause of the adverse action.  The Court suggested that this holding also applies to Title VII claims.  Id. at 1191.  However, the decision was based on the inclusion of the "motivating factor" language contained in the USERRA and Title VII.  As previously noted, the ADA does not contain such language.  Accordingly, this case is more appropriately governed by the Gross standard.

provided by Farrell related to plaintiff's ineffectiveness as a supervisor, inadequate performance, and insubordination.[18]   A reasonable jury could conclude that, were it not for the actions of Rackliffe and McCarthy, Farrell would not have believed that plaintiff was ineffective or insubordinate, and would not have terminated him.

Plaintiff has also submitted sufficient evidence to establish that Rackliffe and McCarthy had a discriminatory motive and their legitimate reasons for seeking his termination were pretextual.  It is abundantly clear from the record that Rackliffe and McCarthy disliked plaintiff.  A reasonable jury could conclude that this dislike stemmed from his protection of Welch.

IV. Conclusion

Plaintiff has established disputed issues of material fact as to (1) whether Rackliffe and McCarthy sought to have him terminated because he protested their discriminatory activities, and (2) whether their actions were a but for cause of his termination.  Because a reasonable jury could find for the

_____

[18] The seventh stated reason dealt with plaintiff's use of the "n-word" on September 17, 2002.  The Town argues that this incident alone justified plaintiff's termination.  Farrell told the plaintiff prior to that date that she considered racial slurs grounds for immediate dismissal.  But a jury could find that this incident alone would not have led to plaintiff's dismissal.  The SBMA found that plaintiff's use of racial slurs, standing alone, would not have justified his dismissal.

plaintiff on these issues, the motion for summary judgment on remand (doc. 93) is hereby denied.

So ordered this 30th day of September 2011.


                              _____/s/ RNC_____
                              Robert N. Chatigny
                              United States District Judge